*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 08a0267p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

CAROLYN PHILLIPS, Representative of the Estate of
Sonya Denise Phillips,

*Plaintiff-Appellee,*

*v.*

ROANE COUNTY, TENNESSEE, et al.,

*Defendants,*

KEN YAGER, Mayor of Roane County, DAVID
HAGGARD, Sheriff of Roane County, GLORIA
WRIGHT, Administrative Director of Roane County
Ambulance Services, FAY HALL, LINDA MAYES,
JOHN MAYES, KELLY JACKSON, CATHY GOSS,
THOMAS PIO, SANDRA MILLER, STACEE FRENCH,
LINDA CARTER, JESSE RITTENHOUSE, THOMAS
MELTON, "OFFICER" BELCHER, Correctional
Officers for Roane County, HOWIE ROSE, DURANDA
TIPTON, Roane County E.M.T., all in their
individual capacities,

*Defendants-Appellants (07-5405),*

THOMAS BODUCH, M.D.,

*Defendant-Appellant (07-5407).*

Nos. 07-5405/5407

Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.
No. 00-00692—Thomas W. Phillips, District Judge.

Argued: March 18, 2008

Decided and Filed: July 25, 2008

Before: RYAN, SILER, and COLE, Circuit Judges.

---

**COUNSEL**

**ARGUED:** Jeffrey R. Thompson, O'NEIL, PARKER & WILLIAMSON, Knoxville, Tennessee,
Jon G. Roach, WATSON, ROACH, BATSON, ROWELL & LAUDERBACK, Knoxville,

1

Tennessee, for Appellants.  Dan C. Stanley, STANLEY & KURTZ, Knoxville, Tennessee, for Appellee.  **ON BRIEF:** Jeffrey R. Thompson, O'NEIL, PARKER & WILLIAMSON, Knoxville, Tennessee, Jon G. Roach, WATSON, ROACH, BATSON, ROWELL & LAUDERBACK, Knoxville, Tennessee, for Appellants.  Dan C. Stanley, STANLEY & KURTZ, Knoxville, Tennessee, for Appellee.

COLE, J., delivered the opinion of the court, in which SILER, J., joined.  RYAN, J. (pp. 11-12), delivered a separate opinion concurring in part and dissenting in part.

———————————

**OPINION**

———————————

R. GUY COLE, JR., Circuit Judge.  Plaintiff-Appellee Carolyn Phillips, the representative of Sonya Denise Phillips's Estate (hereinafter "the Estate"), filed this claim under 42 U.S.C. § 1983 against various governmental officials, alleging that they were deliberately indifferent to Phillips's serious medical needs.  At issue in this case is whether the district court properly denied qualified immunity to the officials.  Viewing the facts in the light most favorable to the Estate, we **AFFIRM** the denial of qualified immunity to the correctional officers of Roane County, Duranda Tipton, and Dr. Thomas Boduch, **REVERSE** the denial of qualified immunity to Ken Yager, David Haggard, Gloria Wright, and Howie Rose, and **REMAND** this case for further proceedings consistent with this opinion.

## I.  BACKGROUND

Sonya Phillips died on December 8, 2000, while awaiting trial for the murder of her infant child at the Roane County Jail, located in Kingston, Tennessee.  Examiners determined her cause of death to be diabetes-ketoacidosis, or untreated diabetes.

The events leading up to Phillips's death began on November 24, 2000, when correctional officers found her unconscious in her cell, not breathing, and with no detectable pulse.  Before paramedics arrived, Phillips had regained consciousness, though fellow inmates observed that Phillips continued to "walk[] very slow," and appeared to be "very swollen," with her "skin color [] almost purplish."  When one of the paramedics, Duranda Tipton, asked whether Phillips should be transported to the emergency room for evaluation, Captain Fay Hall responded that she should be left in the jail if she was not in "distress."

Over the next two weeks, Phillips's physical condition continued to deteriorate.  Nedra Forrester, an inmate confined with Phillips during this time, explained that she had to "clothe and bathe [Phillips] because she could not do these things on her own."  Forrester also observed that Phillips "became worse as time went on, and began vomiting more often, and passing out.  At some point [Phillips] began vomiting what appeared to be blood."  According to Melinda Shirks, a respiratory therapist detained in the Roane County Jail at the time of Phillips's death, Phillips "appeared very sick . . . [and] [h]er breathing sounded horrible, like the type of breathing one does when they are smothering, almost fluid like."  Concerned about her condition, prison officials removed Phillips from her prison cell to a special holding cell for medical evaluation, where Phillips continued to complain of chest pains, nausea, constipation, and fatigue.

On November 27, Phillips filed a medical request form stating that she was experiencing "chest pains, numbness on [the] left side [of her body], legs, [and] arms," that she could not "stand up over 4 to 5 min[utes] without getting dizzy," and that she "need[ed] to see [a] doctor as soon as possible."  Two days later, on November 29, Dr. Thomas Boduch, a contract doctor with the Roane County Jail, gave Phillips a brief examination in which he saw her for a total of six minutes.

According to Dr. Boduch, Phillips reported that all her previous symptoms had disappeared except for knee pain, for which Dr. Boduch prescribed Ibuprofen.

Unsurprisingly, the Estate views this interaction quite differently. An inmate who spoke to Phillips immediately after the examination testified that Dr. Boduch "just glanced at her and prescribed some pill," and "failed to even touch her." The Estate also alleges that Dr. Boduch knew of her collapse on November 24, but instead of following the protocols that he had been responsible for at the jail, which would have required officials to transport Phillips to an emergency room, Dr. Boduch took no action.

On December 4, Phillips filed another medical request form complaining of "nausea, constipat[ion]," and a possible "kidney infection." When Dr. Boduch appeared for his regularly scheduled weekly visit two days later, Phillips was unavailable because she had been transported to a previously scheduled psychiatric appointment. In her absence, Dr. Boduch reviewed her medical request and prescribed antibiotics and ordered a urinalysis, but failed to follow up with Phillips or confirm that the test had been completed.

A few days later, correctional officers again placed Phillips in a holding cell for medical observation. When Phillips continued to complain of the same symptoms—vomiting, nausea, chest pains, and constipation—the officers turned off the water in the holding cell so that she could not flush the toilet in order to verify her claims. At no point, however, did officials deem Phillips's condition sufficiently serious to require medical evaluation.

On the morning of December 8, officers found Phillips lying on her cell floor with blood coming from her mouth, apparently from an injured lip. Later that day, at approximately 3:00 p.m., Captain Hall contacted Ridgeview Psychiatric Hospital, a facility from which Phillips regularly received treatment, to inquire whether Phillips was overly medicated, since Phillips appeared to be dizzy, lethargic, and nauseated. In response, a doctor at Ridgeview directed correctional officers to reduce Phillips's dosage of Zyprexa. At approximately 5:20 p.m., officers again found Phillips unconscious; this time they could not revive her. After being transported to the Roane County Medical Center, Phillips was pronounced dead.

Within twelve days of her death, the Estate filed a § 1983 action against Roane County; David Haggard, the Sheriff of Roane County; and Hall, the head correctional officer in Roane County, alleging that they were deliberately indifferent to Phillips's serious medical needs in violation of the Fourteenth Amendment, and raising several state-law claims. Over the course of the next few months, the Estate filed amendments to its complaint, adding as defendants Ken Yager, the Roane County Executive, the correctional officers in Roane County, the Ambulance Service of Roane County ("ASRC"), employees of the ASRC, and Dr. Boduch.

The correctional officers, paramedics, governmental supervisors, and governmental employees collectively filed a motion for summary judgment, which asserted a defense of qualified immunity. Independently, Dr. Boduch also filed a motion for summary judgment claiming qualified immunity.

Considering each group of defendants independently, the district court denied their motions. The court first found that a genuine issue of material fact existed as to whether the correctional officers, paramedics, and Dr. Boduch were deliberately indifferent to Phillips's serious medical condition. *Estate of Phillips ex rel. Phillips v. Roane County*, No. 3:00-CV-692 (630), 2007 WL 788325, at *5-8 (E.D. Tenn. Mar. 14, 2007). The court also determined that the correctional officers' failure to follow established protocols demonstrated a practice or custom of deliberate indifference to inmates' serious medical needs. *Id.* at *7-8.

In response to the Defendants' claim for qualified immunity, the court explained that "[b]ecause determining deliberate indifference to a serious medical need in this context is such a fact-intensive endeavor, summary judgment is improper. In short, where the legal question of qualified immunity turns upon which version of the facts one accepts, the jury, not the judge, must determine liability, and thus summary judgment should not be granted." *Id.* at \*9. The Defendants timely appealed the district court's denial of qualified immunity.

## II. JURISDICTION

Although "[a] denial of summary judgment is generally not a final judgment" appealable to this court, parties may appeal a "collateral order[] where (1) the defendant is a public official asserting the defense of qualified immunity, and (2) the issue appealed concerns not which facts the parties might be able to prove, but whether certain alleged facts reflect a violation of clearly established law." *Hoover v. Radabaugh*, 307 F.3d 460, 465 (6th Cir. 2002). But this exception is a narrow one. A denial of a claim of qualified immunity is immediately appealable only if the appeal is premised not on a factual dispute, but rather on "neat abstract issues of law." *Johnson v. Jones*, 515 U.S. 304, 317 (1995) (citation omitted). Accordingly, a defendant must essentially "concede the most favorable view of the facts to the plaintiff for purposes of the appeal," and limit his argument to questions of law premised on facts taken in the light most favorable to the plaintiff. *Berryman v. Rieger*, 150 F.3d 561, 563 (6th Cir. 1998).

"Where qualified immunity is denied due to a lingering question of whether the evidence supports a finding that particular offensive conduct occurred, we would lack appellate jurisdiction because the qualified immunity determination of whether a constitutional violation took place is inextricably linked to the merits of the underlying action." *Meals v. City of Memphis*, 493 F.3d 720, 727 (6th Cir. 2007) (citing *Behrens v. Pelletier*, 516 U.S. 299, 313 (1996)). Thus, to the extent that the Defendants' arguments contest the Estate's version of the facts, or the inferences drawn from them—e.g., whether the evidence adequately shows that each defendant knew of and consciously disregarded a serious medical condition—we lack jurisdiction to consider those arguments. *Cf. Williams v. Mehra*, 186 F.3d 685, 690 (6th Cir. 1999) (en banc).

## III. ANALYSIS

This Court reviews a district court's grant of summary judgment on the ground of qualified immunity de novo. *Williams*, 186 F.3d at 689. Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that there are no genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The ultimate inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

"To state a claim under 42 U.S.C. § 1983, a plaintiff must set forth facts that, when construed favorably, establish (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006) (citing *West v. Atkins*, 487 U.S. 42, 48 (1988)).

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In determining whether the government officials in this case are entitled to qualified immunity, we ask two questions: First, viewing the

facts in the light most favorable to the plaintiff, has the plaintiff has shown that a constitutional violation has occurred?  Second, was the right clearly established at the time of the violation?  *See Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006).

The district court concluded that the first step of the qualified immunity inquiry—whether the Estate had shown a constitutional violation—and the merits of Phillips's deliberate indifference claims were identical, since both concerned the reasonableness of the correctional officers' conduct in light of the circumstances the officers faced.  On this basis, the district court found summary judgment based on qualified immunity inappropriate.  *See Phillips*, 2007 WL 788325, at *9 ("[W]here the legal question of qualified immunity turns upon which version of the facts one accepts, the jury, not the judge, must determine liability, and thus summary judgment should not be granted.").

But we believe that the district court erred in deferring the qualified immunity analysis to the jury.  In so finding, we begin with the presumption that "[q]ualified immunity is '*an immunity from suit* rather than a mere defense to liability; and like an absolute immunity it is effectively lost if a case is erroneously permitted to go to trial.'" *Scott v. Harris*, 127 S. Ct. 1769, 1774 n.2 (2007) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).  "The approach [the district court] adopted—to deny summary judgment any time a material issue of fact remains on the [deliberate indifference claim]—could undermine the goal of qualified immunity to 'avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment.'" *Saucier v. Katz*, 533 U.S. 194, 202 (2001) (citing *Harlow*, 457 U.S. at 818).  Thus, in a suit against government officials for an alleged violation of a constitutional right, the court—not the jury—must consider the "threshold question" of whether "the facts alleged show the officer's conduct violated a constitutional right."  *Id*. at 201.  We review de novo whether those facts as alleged by the Estate establish a prima facie case of deliberate indifference to serious medical needs, and whether that right was clearly established.

## A.  Was there a Constitutional Violation?

The Eighth Amendment's prohibition on cruel and unusual punishment generally provides the basis to assert a § 1983 claim of deliberate indifference to serious medical needs, but where that claim is asserted on behalf of a pre-trial detainee, the Due Process Clause of the Fourteenth Amendment is the proper starting point.  *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983) ("[T]he due process rights of a [pre-trial detainee] are at least as great as the Eighth Amendment protections available to a convicted prisoner.").  Prison officials' deliberate indifference violates an inmate's rights "[w]hen the indifference is manifested by . . . prison guards in intentionally denying or delaying access to medical care" for a serious medical need.  *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976).

A constitutional claim for deliberate indifference to serious medical needs requires a showing of objective and subjective components.  The objective component requires a plaintiff to show the existence of a "sufficiently serious" medical need.  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  We have previously explained that "where a plaintiff's claims arise from an injury 'so obvious that even a layperson would easily recognize the necessity for a doctor's attention,' . . . it is sufficient to show that he actually experienced the need for medical treatment, and that the need was not addressed within a reasonable time frame." *Blackmore v. Kalamazoo County*, 390 F.3d 890, 899-900 (6th Cir. 2004) (citation omitted).  In contrast, the subjective component requires a plaintiff to "allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001) (citing *Farmer*, 511 U.S. at 837).  Although the latter, subjective standard "is meant to prevent the constitutionalization of medical malpractice claims," a plaintiff need not show that the officer acted with the specific

intent to cause harm. *Id.* Indeed, "'deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk.'" *Id.* (quoting *Farmer*, 511 U.S. at 836). Officials, of course, do not readily admit this subjective component, so "it [is] permissible for reviewing courts to infer from circumstantial evidence that a prison official had the requisite knowledge." *Id.*

### 1. Objective Component

In the light most favorable to the Estate, the facts show that on November 24, 2000, approximately two weeks prior to Phillips's death, fellow inmates found her unconscious, not breathing, and without a pulse. Over the next two weeks, Phillips repeatedly complained to prison officials about her deteriorating physical condition, including symptoms of "chest pains, numbness on [the] left side [of her body], legs, [and] arms," dizziness, vomiting, "nausea, constipat[ion]," and a possible "kidney infection." One fellow inmate described Phillips as "extremely sick," and noted that her condition "was obvious to normal persons." From this, we conclude that these symptoms show the existence of a sufficiently serious medical condition, which was "so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Blackmore*, 390 F.3d at 899-900 (citation omitted).

### 2. Subjective Component

The next issue is (1) whether the facts when viewed in the light most favorable to the Estate show that the Defendants had subjective knowledge of Phillips's serious need for medical attention; and (2) provided they did, whether the Defendants disregarded that need.

#### (a) *Correctional Officers Defendants*

In the light most favorable to the Estate, the facts show that each of the correctional officers knew of Phillips's condition. First, on November 24, 2000, the day in which fellow inmates found Phillips unconscious, officers Linda Mayes, John Mayes, Kelly Jackson, Jesse Rittenhouse, Fay Hall, and Duranda Tipton were on duty. Second, and on that same day, correctional officers placed Phillips in a holding cell intended for inmates with serious conditions so that officers could monitor closely the inmates' health status. According to prison jail logs, the entire time Phillips remained in the holding cell for observation, she continued to exhibit signs of a serious medical condition, including nausea, vomiting of blood, swelling, lethargy, and chest pains. And when an inmate is placed in this type of holding cell, correctional officers must inform the next incoming shift of the reason the inmate had been placed under observation. Finally, the record reflects that on November 27, December 2, December 6, and again on December 7—a period in which every correctional officer defendant had been on shift—Phillips repeatedly complained about shortness of breath and chest pains. In total, we conclude that the Estate has sufficiently alleged that each of the officers had been exposed to Phillips's serious condition at some point between November 24, the day in which she was found unconscious, and December 8, the day of her death. *See Farmer*, 511 U.S. at 842 ("[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.").

The facts also show that the correctional officers possessed a sufficiently culpable state of mind in denying Phillips the appropriate medical care. Although we have acknowledged that the requisite state of mind "entails something more than mere negligence," *id.* at 835, the Estate does not need to show that the correctional officers acted with the "very purpose of causing harm or with knowledge that harm will result," *id.* In this regard, we find persuasive the correctional officers' disregard of prison protocols, which describe the actions that officers should take when an inmate makes certain medical complaints or exhibits certain medical symptoms. Most notably, when the inmate complains of chest pain, the protocols require the officers to "[t]ransport [the inmate] to

Roane Medical Center ER for evaluation." As we have previously discussed, on multiple separate occasions between November 24 and December 8, Phillips complained of serious symptoms, including chest pains, but at no point did the correctional officers transport her to a hospital emergency room for diagnosis.

Moreover, according to the affidavit of Forrester, a fellow inmate, Phillips "was extremely sick, and it was obvious to normal persons." When Forrester told some correctional officers that she believed Phillips needed medical attention, "[t]hey would not listen, but instead, just walked on by." One eyewitness, Patrick Cooley, an attorney from Kingston, Tennessee who was at the jail just hours before Phillips was found dead, heard an unidentified correctional officer say to Hall, "I am trying to give [Phillips] her medicine and she's acting like she's sick again." According to Cooley, "[t]he statement made by the unidentified corrections officer was made in a tone that clearly indicated that such medical problems have been ongoing, and that jail personnel, including the unidentified corrections officer, were deliberately indifferent to the medical treatment of Sonya Phillips."

Given the substantial evidence before the district court that Phillips exhibited life-threatening symptoms over a two-week period, and the correctional officers' failure to transport her to a hospital for diagnosis, we conclude that there is sufficient evidence to demonstrate the subjective component of deliberate indifference. The correctional officers may "not escape liability if the evidence showed that [they] merely refused to verify underlying facts that [they] strongly suspected to be true, or declined to confirm inferences of risk that [they] strongly suspected to exist." *Farmer*, 511 U.S. at 843 n.8. *See also Estate of Carter v. City of Detroit*, 408 F.3d 305, 313 (6th Cir. 2005) ("In most cases in which the defendant is alleged to have failed to provide treatment, there is no testimony about what inferences the defendant in fact drew. Nonetheless, in those cases, a genuine issue of material fact as to deliberate indifference can be based on a strong showing on the objective component.").

The correctional officers argue on appeal that the district court erred by not addressing the subjective component of a deliberate indifference claim as to each individual correctional officer. Instead of analyzing the defendants separately, the district court denied summary judgment en masse to all twenty correctional officers and explained that "the actions of each defendant jailer are not sufficiently clear, and, [are] therefore, deemed a question of fact for jury determination." *Phillips*, 2007 WL 788325, at *6. Although we agree with the district court's ultimate disposition, we disagree in part with its reasoning. In *Garretson v. City of Madison Heights*, 407 F.3d 789, 797 (6th Cir. 2005), we recognized that "[t]he subjective component [of a deliberate indifference claim] must be addressed for each officer individually." Where, as here, the district court is faced with multiple defendants asserting qualified immunity defenses, the court should consider whether each individual defendant had a sufficiently culpable state of mind.

That being said, we do not read *Garretson* as prescribing a rule that plaintiffs cannot present general allegations to prove that each individual defendant has the requisite knowledge for deliberate indifference. Though broad and conclusory accusations should not necessarily be imputed to each individual defendant, here, the Estate contends: (1) that each individual officer knew of Phillips's collapse on November 24 and her subsequent complaints of other symptoms, (2) that her deteriorating physical condition two weeks prior to her death was so obvious that no reasonable officer working at the jail could have seen her and not disregarded that risk, and (3) that each individual officer had clear instructions to transport an inmate with such symptoms to an emergency room, but none did so. With those allegations in mind, we conclude that there is sufficient evidence from which a trier of fact could infer that each individual correctional officer had an objective

awareness as to the seriousness of Phillips's ailment, and that their failure to do anything about her ailments amounted to deliberate indifference.[1]

### (b)  *Paramedic Defendants*

In the light most favorable to the Estate, the facts show that Duranda Tipton, the paramedic who responded to the incident on November 24, knew of Phillips's condition. Tipton filed an ambulance report indicating that Phillips was found by prison officials to be unresponsive, with no pulse or respiration. Although Phillips regained consciousness prior to the paramedics' arrival, Tipton also noted in her report that Phillips complained of stiffness in her extremities, chest pain, difficulty in breathing, and nausea after she regained consciousness. In her deposition, Tipton also admitted that Phillips's symptoms were consistent with post-cardiac arrest.

The facts also show that Tipton possessed a sufficiently culpable state of mind when denying Phillips the appropriate medical care. According to the testimony of Dr. Robert Dukes, Medical Director of Roane Medical Center, "the function of EMS is not to examine, diagnose, and treat patients, but instead, to transport patients who need help to the emergency department." As such, when a person is reported to have no pulse, the protocols require paramedics to transport that person to an emergency room for evaluation by a physician. In particular, "[c]hest pain demands an evaluation." In addition to Dukes's statement, David Brent Lemonds, a licensed paramedic, stated in his affidavit that the failure to transport Phillips, the failure to contact any physician, and the failure to get any response from Phillips regarding a refusal to transport all constituted not only negligence, but deliberate indifference. Likewise, Larry Davis, a licensed physician and faculty member of the University of Tennessee Department of Family Practice in Knoxville, testified that the failure to send Phillips to a hospital constituted "a violation of written protocols and reflects a callous indifference to the medical needs of the patient." Accordingly, because we find that Tipton had subjective knowledge of Phillips's need for medical attention and disregarded that need, we affirm the district court's denial of qualified immunity.

Nevertheless, we conclude that the district court erred in denying qualified immunity to Howie Rose, the paramedic called to examine Phillips the morning of her death. Nothing in the record indicates that Rose was informed of Phillips's cardiac arrest on November 24, or her complaints of chest pain, nausea, and vomiting. When Rose found Phillips in her cell, she appeared "awake and alert, [and] answered questions appropriately." Rose checked Phillips's blood pressure, pulse, skin, respiration rate, pupils, and abdomen, which all appeared normal. Although Rose advised Hall to contact a physician, he noted that "nothing [he] found at that moment really alarmed [him]. All of [Phillips's] vital signs were within normal limits and her level of consciousness was . . . awake and alert." As such, the Estate has failed to allege that Rose had knowledge of Phillips's serious need for medical attention. We therefore reverse the district court's denial of qualified immunity to Rose.

### (c)  *Supervisor Defendants*

In the light most favorable to the Estate, the facts are insufficient to show that Yager (the Mayor of Roane County), Haggard (the Sheriff of Roane County), and Wright (the Administrative Director of the ambulance services), met the requisite standard for deliberate indifference. The Estate contends, and the district court agreed, that these three supervisors' collective failure to train

---

[1] According to the Roane County Judicial Needs Assessment, there are eighteen jailers and one jail captain responsible for the day-to-day operation of Roane County Jail, a facility that has a rated inmate capacity of fifty-seven. Although we acknowledge the individualized nature of a qualified immunity analysis, given the modest size of the jail and the obvious nature of Phillips's symptoms, we find unpersuasive the claim that the officers were unaware of her condition.

their employees as to the proper protocols constituted sufficient evidence that they should held liable in their individual capacities.  But we believe that this improperly conflates a § 1983 claim of individual supervisory liability with one of municipal liability.

"This court has held that § 1983 liability must be based on more than respondeat superior, or the right to control employees."  *Shehee v Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999).  A supervisor is not liable pursuant to § 1983 for failing to train unless the supervisor "either encouraged the specific incident of misconduct or in some other way directly participated in it.  At a minimum a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Id.* (quoting *Hays v. Jefferson County*, 668 F.2d 869, 874 (6th Cir.1982)).

Although the district court found that there was a genuine issue of material fact as to whether Roane County had a policy or custom of deliberately ignoring prisoners' medical needs, that finding is not on appeal.  *See Meals*, 493 F.3d at 727 (a city is not entitled to appeal the district court's denial of summary judgment on an interlocutory appeal).  The Estate's general allegations that the correctional officers and paramedics were not properly trained are more appropriately submitted as evidence to support a failure-to-train theory against the municipality itself, and not the supervisors in their individual capacities. *See City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (recognizing that a systematic failure to train officers adequately as a custom or policy may lead to city liability).  While an individual supervisor may still be held liable in his or her individual capacity under a failure-to-train theory, the Estate must point to a specific action of each individual supervisor to defeat a qualified immunity claim.  And because the Estate has not advanced any specific allegations against Yager, Haggard, or Wright, we dismiss the case against these three defendants.

### (d)  *Dr. Thomas Boduch*

Finally, we conclude that the facts, as alleged by the Estate, show that Dr. Boduch knew of and consciously disregarded a serious medical risk to Phillips.  In cases involving mistreatment by medical personnel, this Court has held that "less flagrant conduct [than that of other government officials] may constitute deliberate indifference." *Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 843 (6th Cir. 2002).  Although a government doctor may be entitled to qualified immunity, to be so he "has a duty to do more than simply provide some treatment to a prisoner who has serious medical needs; instead, the doctor must provide medical treatment to the patient without consciously exposing the patient to an excessive risk of serious harm." *LeMarbe v. Wisneski*, 266 F.3d 429, 439 (6th Cir. 2001).  To determine whether Dr. Boduch's conduct rose to that level, we ask whether a reasonable doctor in his position could have concluded that a substantial risk of serious harm to Phillips existed. *Id.*

Like the correctional-officer defendants, Dr. Boduch knew of the events of November 24, in which Phillips was found unconscious.  Instead of following the very protocols that he implemented for the correctional officers, which require officials to transport inmates to an emergency room when suffering from chest pain, Dr. Boduch took no action.  Furthermore, according an affidavit submitted by Davis, a physician licensed in Tennessee, Dr. Boduch's actions—or more accurately, his failure to act—constituted a callous indifference to Phillips's medical needs.  Davis opined that during the period of November 24 to December 8, when Phillips complained of nausea, vomiting, and chest pains, "Boduch failed to establish and maintain a medical record for this patient that would meet any minimum criterion for an acceptable medical records . . . ."

Despite Phillips's complaints and documented ailments, on November 29, Dr. Boduch only gave her a brief examination—if you can even call it that—in which he saw her for a total of six minutes, ran no tests, and according to at least one inmate, "failed to even touch her."  Dr. Boduch

ultimately prescribed Ibuprofen for her ailments.  A few days later, when Phillips submitted a medical request in which she complained of a possible "kidney infection" and "odor from urine," Dr. Boduch ordered a urinalysis, but failed to follow up or confirm that the test had been done.  We believe that these allegations, conceded as true for the purposes of this appeal, are sufficient to establish that Dr. Boduch had knowledge of Phillips's serious need for medical attention and disregarded that need.  To the extent that Dr. Boduch now disputes those facts and contends that his actions were reasonable, we lack jurisdiction to hear those arguments on an interlocutory appeal. *See Williams*, 186 F.3d at 690.

## B.  Was the Law Clearly Established?

"For a right to be clearly established, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"  *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003) (quoting *Russo v. City of Cincinnati*, 953 F.2d 1036, 1042 (6th Cir. 1992)) (alteration in original).

At the time of Phillips's death, she was entitled to medical attention under the Fourteenth Amendment.  In *Estate of Carter*, this Court recognized that "[a]s early as 1972, this court stated 'where the circumstances are clearly sufficient to indicate the need of medical attention for injury or illness, the denial of such aid constitutes the deprivation of constitutional due process.'" 408 F.3d at 313 (quoting *Fitzke v. Shappell*, 468 F.2d 1072, 1076 (6th Cir. 1972)); *see also Estate of Owensby v. City of Cincinnati*, 414 F.3d 596, 604 (6th Cir. 2005) ("[T]he Fourteenth Amendment right of pretrial detainees to adequate medical care is, and has long been, clearly established.").  To make this right absolutely apparent, "in 1992, this Court explicitly held that a pretrial detainee's right to medical treatment for a serious medical need has been established since at least 1987." *Estate of Carter*, 408 F.3d at 313 (citing *Heflin v. Stewart County*, 958 F.2d 709, 717 (6th Cir. 1992)).

## IV.  CONCLUSION

For the aforementioned reasons, we **AFFIRM** the denial of qualified immunity to the correctional officers, Tipton, and Dr. Boduch, **REVERSE** the denial of qualified immunity to Yager, Haggard, Wright, and Rose, and **REMAND** this case for further proceedings consistent with this opinion.

---

**CONCURRING IN PART, DISSENTING IN PART**

---

RYAN, Circuit Judge, concurring in part and dissenting in part. In my view the correctional officers are entitled to claim qualified immunity because Phillips has not "allege[d] facts [in the complaint] which, if true, would show that [each officer] being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001).

At the heart of this case lies the Eighth Amendment which proscribes "cruel and unusual punishment." U.S. CONST. amend. VIII. Ordinarily, any state jailer who imposes such punishment may be made to respond in damages.

The Supreme Court has held that when the victim of mistreatment by the jailers is a pretrial detainee, his entitlement to recovering damages is rooted in the Due Process Clause of the Fourteenth Amendment. *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244 (1983). The pretrial detainee succeeds in alleging an Eighth Amendment violation or something analogous to it merely by asserting "deliberate indifference to [his] serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Additionally, jailers may he held liable to pretrial detainees for "deliberate indifference" to the detainee's "serious medical needs" if the complainant can prove that the accused jailer "[1] subjectively perceived facts from which to infer substantial risk to the prisoner, [2] that he did in fact draw the inference, and [3] that he then disregarded that risk." *Comstock*, 273 F.3d at 703.

In *Farmer v. Brennan*, 511 U.S. 825 (1994), the Supreme Court explicitly imposed a requirement that a defendant must be shown to be subjectively culpable in order to conclude that he was deliberately indifferent to the needs of a prisoner: It is axiomatic that an "official[] who lacked knowledge of a risk cannot be said to have inflicted punishment." *Farmer*, 511 U.S. at 844. At the same time, the Court acknowledged that there may be instances where the circumstances are so obvious that any reasonable person in the position of the jailer must have known that the prisoner was at serious risk. This proposition must be understood, however, in the context of the whole of the *Farmer* opinion, which explicitly rejected an objective test alone for determining when an officer is deliberately indifferent to a serious medical need.

A state actor/jailer is, of course, immune from suit for injury and even death of a pretrial detainee unless each of the elements of a "deliberate indifference" claim is alleged with specificity in the § 1983 complaint.

The majority opinion uses the "obviousness" rationale to conclude that each officer "had to" have known of the serious risk to Phillips's health and was therefore purposefully indifferent to her. But whether each officer knew or did not know of Phillips's condition is not the point; the issue is whether the plaintiff has alleged specific facts asserting that *each* jailer *did* know of the seriousness of Phillips's health problems because he perceived facts sufficient to infer it; that he drew the inference; and that he chose to disregard the risk. It is clear to me that Phillips has not made these allegations.

Phillips has not alleged facts that each defendant-correctional officer was deliberately indifferent to Phillips's serious medical needs for two principal reasons:  1) the absence of allegations that each officer was aware of facts from which he must have concluded that Phillips was at serious risk; and 2) the absence of allegations of *fact* asserting that each officer chose to, and did, disregard the inference that he had drawn that Phillips was at serious risk. Phillips's jailers and other

personnel expended considerable effort in trying to get to the root cause of her illness. Certainly, it cannot be concluded that each officer *must* have known that she was at serious risk and that the treatment method employed was insufficient to address this need. And the scant and generalized allegations of Phillips's complaint do not assert that the correctional officers actually perceived that she was at serious risk.

It is important to remember that at all times, the burden remains with Phillips to show that each of the correctional officers is not entitled to qualified immunity. Rather than alleging facts that demonstrate that each defendant was deliberately indifferent to Phillips's serious medical needs, Phillips presents only broad and conclusory allegations that the correctional officers were present during periods in which Phillips's health deteriorated and therefore *must* have known of the seriousness of her illness, and knowingly failed to take measures to help Phillips that in lawsuit hindsight they might have taken.

These allegations, although spread over a lengthy and detailed complaint, do not allege facts sufficient to defeat the correctional officers' claims of qualified immunity.

Therefore I would **REVERSE** the denial of qualified immunity to all of the correctional officers and concur in the remainder of my brother's opinion.