NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 15a0649n.06

Case No. 14-2158

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Sep 24, 2015
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| HOWARD LINDEN, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF MICHIGAN |
| THOMAS PIOTROWSKI; SEVAN ZAYTO, | ) | |
| | ) | **OPINION** |
| Defendants-Appellants. | ) | |
| | ) | |

BEFORE: DAUGHTREY, GIBBONS, and GRIFFIN; Circuit Judges.

JULIA SMITH GIBBONS, Circuit Judge.  This is an interlocutory appeal of the denial of qualified immunity to two Highland Park, Michigan, police officers who responded to the scene of a shooting and allegedly exhibited deliberate indifference to the serious medical needs of one of the shooting victims, Ronald Black, Jr., who later died of his wounds.  Howard Linden, the personal representative of Black's estate, brought this civil action for money damages under 42 U.S.C. § 1983 against the officers for violating Black's Fourteenth Amendment rights.  The officers moved for summary judgment by reason of qualified immunity, but the district court denied their motion.  Because the constitutional right at issue was not clearly established in the context of this case, the officers are entitled to qualified immunity, and we reverse.

I.

On the evening of January 18, 2013, eighteen-year-old Ronald Black and several other individuals were playing cards inside the house located at 322 Labelle Street in Highland Park,

Michigan. At approximately 11:40 pm, one of the other people—John Bain—pulled out a gun and started firing. Highland Park police officers Thomas Piotrowski and Sevan Zayto received a report of shots fired and quickly responded to the scene. Upon arriving, Officers Piotrowski and Zayto first encountered Antoine Scott on the front porch; he was holding a gun (which it turned out he had wrested away from Bain), and he said that he had to protect his family. The officers told Scott to put the gun down, and he complied. The officers then detained him in the back of their police car.

The officers then proceeded inside the house. According to Piotrowski, they immediately encountered two individuals lying on the floor: one (Bain) had a gunshot wound to his face and appeared to be fatally injured; the other (Robert Givens) was bleeding from his abdomen. A young person, Darrail Pulley, was crouching above Givens. Although it is clear that Black was also shot and died of his wounds later that evening after the medics arrived, the events leading up to Black's death are in dispute.

According to Piotrowski, immediately after the officers entered the house and saw Bain and Robert Givens lying on the floor, he assessed the area to make sure that it was safe and then called for medical assistance for multiple gunshot victims in an unknown number. Piotrowski then focused his attention on Robert Givens, asking him what had happened, applying pressure to his wounds with a gloved hand, and trying to calm Pulley down. According to Piotrowski, he did this until the medics arrived, although at some point he called at least one more time to request medical help because he felt they were taking a long time to show up. Piotrowski said that he did not see Black until after EMS arrived, at which point he went to assess the rest of the scene and found Black "down the hallway towards the kitchen" where he was sitting on the floor. Piotrowski Dep. 25:25, ECF No. 22-1. Another officer was standing near Black.

Piotrowski continued looking around and returned to Black a few minutes later. By this time, according to Piotrowski, Black had been handcuffed with his hands behind his back. Black told the officers that someone had been shooting at him. Piotrowski asked him if he had been shot, and Black—according to Piotrowski—did not respond directly, but only said that his stomach hurt. Piotrowski and Zayto lifted up his shirt to check his abdomen, but did not see anything wrong. According to Piotrowski, they also looked him over for blood stains or signs of gunshot wounds, but did not see anything. The officers did not check his vitals. They did ask whether he had taken any drugs because the house "was a suspected drug house, [and] we didn't know if he swallowed a bunch of drugs." Piotrowski Dep. 35:21-22, ECF No. 22-1. Piotrowski observed that Black was acting strangely, and went outside to see if another EMS unit was there; he did not see one. (The record suggests that the second ambulance never made it to 322 Labelle because it was diverted to attend to Tamesha Glass, who had been upstairs when the shots were fired, broke her window and climbed out, and—bloody from a serious cut to her hand—ran to the nearest open business, a liquor store, which is where the ambulance found her.) Piotrowski called for another EMS unit. By this point Black was screaming in pain, according to Piotrowski. Five to ten minutes later, another EMS unit arrived and Piotrowski told them that Black was acting strangely, that he might have overdosed on something, and that it was unknown whether he had been shot.

As for Zayto, he also said that Piotrowski moved directly to assist Robert Givens once they entered the house. Zayto said that he first encountered Black moments later, when Black came walking into the room directly toward them. Zayto suspected at this point that Black "had something to do with" the shooting, especially after the woman on the staircase (presumably Charlotte Givens) told them that there was no one else left in the house. Zayto Dep. 44:20, ECF

No. 22-2. He instructed Black to put his hands up, and Black complied. Zayto asked him if there was another shooter and Black said he didn't know. Zayto asked Black if he had been shot, and according to Zayto, he said no. Zayto patted Black down and lifted up Black's shirt to see if he had been shot, and then put him in handcuffs, at which time Black asked if he could sit down and said his stomach hurt. Zayto asked Black if he needed EMS, and Black said yes, so Zayto called another EMS unit for him. When the first EMS unit arrived to attend to Givens, who had an obvious abdominal wound, Zayto told them that they also needed to check on Black; they told Zayto that another ambulance was on the way. According to Zayto, only three to five minutes elapsed between the time when he first saw Black and the time when EMS medics were on scene attending to him.

The plaintiff has presented an affidavit from Charlotte Givens, who was present at 322 Labelle during the events in question and in the bathroom when the shots were fired. According to Charlotte Givens, the police officers handcuffed Black when they arrived on scene. She said that Black told the officers multiple times that he had been shot and needed medical assistance. According to Charlotte Givens, not only did the officers not do anything to help Black, but they repeatedly told him that he had not been shot and that he was going to jail, not to the hospital.

The plaintiff also has produced an affidavit from Darrail Pulley, Charlotte Givens's son, who was present that evening. Pulley too said that the officers handcuffed Black after they arrived. According to Pulley, Black was yelling "I'm shot too, I'm shot too!" Pulley Aff. 2:6, ECF No. 24-6. And in response, the officers told Black to shut up, that he had not been shot, and that he was going to jail. Pulley said that the officers "tried to pick [Black] up several [times] to get him to sit up straight, but he kept falling down because he was shot." Pulley Aff. 2:9, ECF No. 24-6. Pulley further said that Black continued to tell the officers multiple times that he had

been shot; "[h]e was talking slowly and he was begging for help." Pulley Aff. 2:10, ECF No. 24-6. According to Pulley, Black said that he could not breathe and needed medical assistance; meanwhile, Robert Givens—who had been shot in the abdomen—was also telling the officers repeatedly that Black had been shot too and needed assistance. Pulley said that notwithstanding all of this, the officers did not direct the first EMS responders to Black.

Plaintiff has further pointed out several apparent inconsistencies in the defendants' account of events. Although Piotrowski initially stated in his deposition that he did not encounter Black for the first time until after EMS arrived, the police report filed by Piotrowski states that he encountered Black during his initial sweep of the house, and that only after speaking to Black and asking if he had been shot did he return to apply pressure to Robert Givens's wounds. Piotrowski also initially stated in his deposition that Black did not give a direct answer when asked if he had been shot, but the police report he filed says that Black specifically said "no" when asked if he had been shot. Zayto said that he did try to get the first EMS responders, who were attending to Givens, to look at Black, but the EMS report for Givens contains no mention of any conversation with officers, whereas the EMS report for Black does. Zayto stated in his deposition that he had pulled Black's shirt up to his head or neck area to check for signs of injury, both in the front and in the back, but he said that he did not see the wound that Black suffered on the back of his shoulder.

EMS records indicate that a request came in at 11:42 pm to send the EMS unit that responded for Robert Givens. That EMS unit was dispatched at 11:52 pm, arrived on scene at 11:54 pm, reached Givens at 11:55 pm, and departed with Givens at 12:03 am. EMS records indicate that another call for medical assistance came in at 11:47 pm. A unit was dispatched at 11:47 pm and reached the scene at 12:07 am—after the first unit had already departed with

Givens.  The medics reached Black at 12:10 am.  According to the EMS report, the medics found Black lying handcuffed on the hallway floor, complaining that he could not breathe but unable to further describe his pain.  The medics looked but did not see any blood spots on the exterior of Black's clothes.  He was wearing multiple shirts, which the medics began to cut off, at which point Black started spitting white foam and vomiting brownish liquid.  Shortly thereafter one of the medics spotted the gunshot wound on Black's shoulder.  While Black was being moved into the back of the ambulance, he stopped breathing and his pulse stopped.  He was pronounced dead at 12:52 am.  The medical examiner described Black's wound as follows:

> There was an entrance gunshot wound on the back of the right shoulder, with no [] evidence of close range firing noted on the skin surrounding this wound.  The wound track passed through the right back muscle and soft tissue, right sixth intercostal space, right lung, diaphragm, liver, duodenum, mesentery, and left common iliac artery and vein, and into the muscle and soft tissue of the left thigh, with extensive bleeding into the right chest and peritoneal cavities.  The wound track was from back to front, right to left, and downward when the body is viewed in the anatomical position.

Post Mortem Report 1, ECF No. 24-3.

On June 4, 2013, Howard Linden, as personal representative of Black's estate, filed a § 1983 suit against Piotrowski and Zayto in their individual capacities, seeking money damages for exhibiting deliberate indifference to Black's serious medical needs in violation of the Eighth and Fourteenth Amendments of the United States Constitution.  Linden additionally brought a claim for gross negligence under Michigan law.  Defendants moved on February 24, 2014, for summary judgment, arguing, *inter alia*, that they were entitled to qualified immunity.  On August 22, 2014, the district court denied their motion:

> Viewing the facts in the light most favorable to the Plaintiff, the Court is persuaded that the circumstances surrounding the knowledge that the officers had at the time of the arrest and the appreciable amount of time that followed between detaining the decedent and the EMS taking him in for treatment raise genuine issues of material fact as to whether the officers acted with "deliberate indifference."

Order Den. Defs.' Mot. for Summ. J. 9-10, ECF No. 27. Defendants timely appealed.

## II.

"[Q]ualified immunity shields government officials . . . from civil damages for discretionary functions 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Range v. Douglas*, 763 F.3d 573, 587 (6th Cir. 2014) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Once a defendant invokes qualified immunity, the plaintiff bears the burden to show that granting qualified immunity would be inappropriate because (1) the defendant violated a constitutional right, and (2) the right was clearly established. *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 680–81 (6th Cir. 2013).

We have interlocutory appellate jurisdiction over the district court's order denying qualified immunity only insofar as that order turns on an issue of law. *Austin v. Redford Twp. Police Dep't*, 690 F.3d 490, 495 (6th Cir. 2012) (citing *Estate of Carter v. City of Detroit*, 408 F.3d 305, 309 (6th Cir. 2005)). For that reason, we generally lack jurisdiction to hear an interlocutory appeal of a district court's determination (such as the district court's determination in this case) that the pretrial record sets forth a genuine issue of material fact for trial, *id.* (quoting *Johnson v. Jones*, 515 U.S. 304, 319–20 (1995)), unless the determination that there is a genuine issue of material fact is "blatantly contradicted by the record," such that one party's account of events could not be believed by any reasonable jury. *Scott v. Harris,* 550 U.S. 372, 380 (2007). However, we retain jurisdiction over the legal question of whether the constitutional

right at issue was clearly established—*i.e.*, whether the facts viewed in the light most favorable to plaintiff violate clearly established law. *Kirby v. Duva*, 530 F.3d 475, 481 (6th Cir. 2008). It is to this question that we now turn. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (holding that courts have discretion to start with either prong of the qualified-immunity analysis). Our review is *de novo*. *Pollard v. City of Columbus*, 780 F.3d 395, 402 (6th Cir. 2015).

III.

A.

The Eighth Amendment forbids "deliberate indifference to serious medical needs of prisoners" because it "constitutes the 'unnecessary and wanton infliction of pain.'" *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976) (joint opinion)). "[I]ntentionally denying or delaying access to medical care" is a constitutional violation. *Id.* at 104–05. The Fourteenth Amendment extends this right to adequate medical treatment to pretrial detainees.[1] *Watkins v. City of Battle Creek*, 273 F.3d 682, 685–86 (6th Cir. 2001) (citing *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)). "Deliberate indifference requires that the defendants knew of and disregarded a substantial risk of serious harm to [the plaintiff's] health and safety." *Watkins*, 273 F.3d at 686 (citing *Farmer v. Brennan*, 511 U.S. 825, 835–37 (1994)). A showing of deliberate indifference thus has objective and subjective components. *Phillips v. Roane Cnty.*, 534 F.3d 531, 539 (6th Cir. 2008). The objective component is that the plaintiff must "show the existence of a 'sufficiently serious' medical need." *Id.* (quoting *Farmer*, 511 U.S. at 834). The subjective component, by contrast,

---

[1] Black plainly was a detainee for purposes of the deliberate-indifference claim. He was handcuffed and was not free to leave the scene. *See, e.g.*, *Estate of Owensby v. City of Cincinnati*, 414 F.3d 596, 600, 603 (6th Cir. 2005) (decedent was considered a detainee for purposes of § 1983 claim where he had been handcuffed and placed in the back of police car). Furthermore, he was detained for long enough—certainly at least as long as the six minutes in *Owensby*—that deliberation was possible and the officers had an opportunity "'to fully consider the potential consequences of their conduct.'" *See id.* at 603 (quoting *Ewolski v. City of Brunswick*, 287 F.3d 492, 510 (6th Cir. 2002)).

"requires a plaintiff to 'allege facts which, if true, would show [1] that the official being sued subjectively perceived facts from which to infer substantial risk to the [detainee], [2] that he did in fact draw the inference, and [3] that he then disregarded that risk.'" *Id.* at 540 (quoting *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001)). A plaintiff may make this showing through circumstantial evidence. *Id.*

For a right to be clearly established, however, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. . . . [I]n the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). The pre-existing law that makes a right clearly established comes primarily from the Supreme Court and the Sixth Circuit, but it can also come from other courts, including other circuits and district courts, if the decisions of those courts "point unmistakably to the unconstitutionality of the conduct" and are "so clearly foreshadowed by applicable direct authority as to leave no doubt in the mind of a reasonable officer that his conduct was unconstitutional." *Perez v. Oakland Cnty.*, 466 F.3d 416, 427 (6th Cir. 2006) (alterations omitted); *see also Holzemer v. City of Memphis*, 621 F.3d 512, 527 (6th Cir. 2010). "A court need not have previously held illegal the conduct in the precise situation at issue because officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Sutton v. Metro. Gov't of Nashville*, 700 F.3d 865, 876 (6th Cir. 2012) (internal quotation marks omitted); *see also Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (noting that in "an obvious case," general standards can clearly establish a constitutional violation, "even without a body of relevant case law").

The question of whether law is clearly established should not be considered at a high level of generality. *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2084 (2011). "The general proposition,

for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." *Id.* (citing *Saucier v. Katz*, 533 U.S. 194, 201–02 (2001)). Defining clearly established law at a high level of generality runs the risk of inappropriately expanding officer liability by permitting allegations of "violation of extremely abstract rights" to proceed. *Anderson*, 483 U.S. at 639. Thus, "the plaintiff must show that the right was clearly established 'in light of the specific context of the case, not as a broad general proposition.'" *Perez*, 466 F.3d at 427 (quoting *Saucier*, 533 U.S. at 201).

B.

The discrepancies in the facts as alleged by the parties do not create material questions of fact that would preclude qualified immunity. It is appropriate for us to hear this case "if, 'despite the fact that the district court thought there were disputed issues of [fact], [the court concludes that] . . ., regardless of the factual dispute, the plaintiffs [do] not have a valid claim.'" *Doe v. Bowles*, 254 F.3d 617, 620 (6th Cir. 2001) (quoting *McCloud v. Testa*, 97 F.3d 1536, 1545 (6th Cir. 1996)). Here, the factual discrepancies are irrelevant to our inquiry of whether the plaintiff's right was clearly established law. Even accepting the plaintiff's version of the facts as true, as we discuss below, the conduct exhibited by Piotrowski and Zayto does not amount to deliberate indifference under clearly established law.

The uncontroverted evidence establishes that within seven minutes of the shooting, defendants had arrived on scene, secured the premises, and called for EMS at least three times while reporting multiple persons with gunshot wounds. Likely for this reason, both in the district court and on appeal, plaintiff has not taken issue with the rapidity of defendants' calls for

medical assistance. Rather, plaintiff makes three other arguments about how defendants allegedly were deliberately indifferent to Black's serious medical needs.

First, plaintiff argues that defendants violated Black's constitutional rights by failing to direct the first emergency medical responders who arrived on scene that they should aid or triage Black. In other words, plaintiff contends that defendants should have redirected the first-arriving medics away from Robert Givens, who was closest to the door and was visibly bleeding from an obvious gunshot wound to his abdomen, to Black, who was saying he had been shot but had no blood visible on his clothing. But plaintiff fails to point to any cases clearly establishing that defendants had such an obligation. The closest plaintiff gets is *Scozzari v. Miedzianowski*, 454 F. App'x 455 (6th Cir. 2012), but even that case falls well short of clearly establishing the right plaintiff asserts. There, police officers shot Scozzari after he allegedly threatened them with a weapon at his cabin. *Id.* at 458–59. We described the officers' actions after the shooting as follows:

> [T]he record is uncontroverted that, seven minutes after they first reported the shooting, Miedzianowski and McGraw had not secured the scene of the incident. As a result, when the ambulance arrived, paramedics were forced to stage off-site for two minutes before approaching. Even then, the Officers instructed paramedics to proceed without disturbing the evidence, further delaying Scozzari's treatment by three minutes. In all, it took twelve minutes, from the initial report of the shooting until paramedics were able to treat Scozzari. Defendants emphasize that medical responders are frequently required to stage off-site until the scene of a shooting is secured. However, they fail to explain why they were unable to secure the scene and search Scozzari before the ambulance arrived. Moreover, there is evidence that the Officers spent at least part of this time knocking on doors and asking neighbors to witness Scozzari's weapons, activities that were unrelated to securing the scene or saving Scozzari's life.

*Id.* at 465. In that factual context, we held that the constitutional right asserted by the plaintiff was clearly established:

> Reasonable officers would have known, based on this Circuit's precedent, that the obligation to provide adequate medical care to an injured detainee is not

> discharged merely by promptly calling for assistance, but extends to ensuring that medical responders are able to access the victim without unreasonable delay.

*Id.* at 466.

But unlike the officers in *Scozzari*, Piotrowski and Zayto—even under the plaintiff's version of events—did not hinder the medics from accessing the victims. At most, defendants did not redirect the first-arriving medics to take a look at Black (for whom another EMS unit had already been called) before the medics focused on Givens. The Constitution does not obviously demand, and *Scozzari* does not clearly establish, that police officers, in a situation like the one faced by Piotrowski and Zayto, must manage in that manner the work being done by medical responders that they have called to the scene.

Plaintiff's second argument, which fares no better, is that defendants violated Black's constitutional rights by failing to inform dispatch of the fact that Black in particular had suffered a gunshot wound and required medical attention. Plaintiff contends that defendants' failure to convey to the dispatcher the particulars of Black's injury delayed his medical care. The uncontroverted evidence, again, is that defendants requested medical assistance multiple times for multiple gunshot victims within minutes of arriving on scene. Plaintiff fails to point to any cases, and we have found none, establishing that an officer is being deliberately indifferent to a detainee's medical needs—in a way that goes beyond poor judgment and actually violates the Constitution—if he calls for emergency medical assistance for multiple gunshot victims without further elaborating on the nature of one of the victim's wounds. A reasonable officer in Piotrowski's or Zayto's position—a position that was, indisputably, a chaotic one—would not have known that his general calls for medical assistance for gunshot victims violated the Constitution.

Finally, in the district court, plaintiff argued that defendants violated Black's constitutional rights by failing to administer rudimentary first aid while they were waiting for the second EMS unit to arrive. Even though the plaintiff raised this argument only in the district court, not in his brief on appeal, we can and should consider it: we can affirm the district court on any ground supported by the record, and the plaintiff-appellee has not waived this argument by not introducing it in his brief because he is the party who prevailed in the district court. *See Kennedy v. City of Villa Hills, Ky.*, 635 F.3d 210, 214 n.2 (6th Cir. 2011). Under plaintiff's version of events, which we are obliged to accept at this stage, the officers, beyond calling for medical assistance and trying to position Black in an upright seated position when he fell over, did not render further assistance to Black when he told them he had been shot. According to plaintiff, defendants' inaction violates their duty to administer first aid to Black, as plaintiff says is clearly established by *Estate of Owensby v. City of Cincinnati*, 414 F.3d 596 (6th Cir. 2005). In that case, plaintiffs' evidence showed that police stopped Owensby after he left a convenience store; the encounter became contentious, and Owensby was tackled by the officers and pinned in a prone position in the parking lot. *Id.* at 599. The officers struck Owensby in his lower back, right arm, and legs, placed him in a "head wrap," and used a pressure point technique to subdue him. *Id.* at 599–600. When another officer arrived, he noticed that Owensby was not moving. *Id.* at 600. Owensby was then handcuffed, and another officer lifted his head and sprayed mace in his face from a distance of six inches. *Id.* Owensby was not resisting and his face was bleeding onto the officers' shirts. *Id.* The officers placed him into the back seat of a police cruiser and continued to beat him, and then left him in the back seat with the doors locked. *Id.* Another officer arrived, looked into the back of the cruiser, and observed to the other officers that Owensby was bleeding and appeared unable to breathe. *Id.* By this point, at least thirteen

police officers were on the scene, three of whom were trained EMTs; none of them did anything to assist Owensby until a sergeant arrived six minutes after Owensby had been placed in the cruiser, asked to check on him, and discovered that he was not breathing. *Id.* at 600-01. Owensby was later pronounced dead as a result of asphyxiation during restraint attempts. *Id.* In that context, taking plaintiffs' version of events as true, we agreed with the district court that the contours of the Owensby's right to medical care were clearly established, such that a reasonable person in the officers' position would have known that Owensby's constitutional rights were being violated. *Id.* at 604.

The differences between this case and *Owensby* are manifest. In short, *Owensby* does not clearly establish that Piotrowski and Zayto did not fulfill their constitutional obligations when they promptly called for medical assistance for Black. The uncontroverted evidence is that Black, unlike Owensby, had no visible manifestations of his injury—no blood was visible on his clothes, and the medics did not discover his gunshot wound until they cut his shirt off. Unlike the officers in *Owensby*, Piotrowski and Zayto did not cause the decedent's injuries and did not have the same reason to know about their extent. *Owensby* does not clearly establish that officers in Piotrowski's and Zayto's situation were being deliberately indifferent to Black's medical needs, in violation of the Eighth and Fourteenth Amendments, by only calling for medical assistance for someone who was saying that he had been shot but had a hard-to-discover gunshot wound and no blood on the exterior of his clothes. Piotrowski's and Zayto's failure to do more was, at most, a mistake in judgment—and qualified immunity "'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 343 (1986)).

IV.

In the context of this case, none of the plaintiff's asserted constitutional rights was clearly established. We need not go further: this conclusion is enough for us to reverse the district court's denial of summary judgment to the defendant officers, who are entitled to qualified immunity.