**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 11a0157n.06

No. 10-3167

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

**Mar 17, 2011**

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| DANIEL B. BORDER, Administrator of the estate of Deceased Adam N. Border; DANIEL B. BORDER; DIANE BORDER, | ) ) ) ) | |
| Plaintiffs-Appellees, | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO |
| v. | ) ) ) | |
| TRUMBULL COUNTY BOARD OF COMMISSIONERS, et al., | ) ) ) | |
| Defendant, | ) ) | |
| and | ) ) | |
| MIKE PALUMBO, | ) ) | |
| Defendant-Appellant. | ) ) | |

BEFORE: MERRITT, CLAY, and GRIFFIN, Circuit Judges.

GRIFFIN, Circuit Judge.

Defendant Mike Palumbo appeals the district court's interlocutory order denying his motion for summary judgment on the basis of qualified immunity from suit under 42 U.S.C. § 1983. For the reasons that follow, we affirm.

I.

The present case arises from the drug-overdose death of a pretrial detainee, plaintiffs'

decedent Adam N. Border, at the Trumbull County Jail in Ohio in January 2008. The relevant facts

are set forth in the district court's Memorandum Opinion and Order denying in pertinent part

defendant Michael Palumbo's motion for summary judgment:

> This action arises out of Adam Border's ("Border") arrest, subsequent transportation, and detention at the Trumbull County Jail. On January 12, 2008, [officers] responded to a BP gas station in Cortland, Ohio after receiving reports of a physical altercation involving Border and his ex-wife, Lacina Smith.
>
> **A. Arrest and Transportation**
>
> At the scene, witnesses observed that Border showed obvious signs of intoxication. In her affidavit, Lacina Smith states that Border was visibly intoxicated, his face was pale, his eyes were glazed, his speech was slurred, he had difficulty maintaining balance, and he had poor coordination. Smith recalls that another witness, Michael Overton, told officers that Border was under the influence.
>
> Lacina Smith also recalls that she witnessed Adam exit the vehicle with a pill bottle in his hand. Smith states that she advised [officers] from the Cortland Police Department that Border was "messed up" and "had a pill bottle on him that was full pills (sic)."
>
> Justin Schubert, a friend of Border, was also present at the scene and recalls that Border appeared intoxicated, had difficulty maintaining eye contact, had difficulty keeping his head up, and had difficulty maintaining consciousness. In his affidavit, Schubert states that he asked officers to "look after" Border. Schubert recalls telling the officers at the time that Border "isn't acting like himself right now." Both Lacina Smith and Justin Schubert state that Border went behind the BP building before the police arrived. According to Schubert, Border was behind the building for approximately 1-2 minutes. A prescription bottle was later found at the scene, but not until a full 24 hours after Border's arrest, and after Border's death.
>
> Border was arrested and transported to the Trumbull County Jail by City of Cortland Police Officer John Weston. In their briefs, multiple parties refer to a video

recording, submitted by the City of Cortland, . . . showing a portion of Border's transportation to the Trumbull County Jail. In the video, Border appears either intoxicated or very tired. While Border appears to nearly nod off multiple times, he is able to hold an intelligible conversation with Officer Weston throughout the video. At no point in the video does the subject of medications come up during the conversation between Border and Officer Weston.

**B. Detention**

At the Trumbull County Jail, Border was booked by Officer Michael Palumbo. Sometime shortly after he was booked, Border was treated by Noreen Whitlock for a gash on his forehead. Whitlock is an unlicensed medical assistant who, on the night of Border's death, was assigned general nursing duties and to distribute medications to inmates. While treating Border's forehead, Whitlock states that she asked Border if he "drank anything or ingested anything." According to Whitlock, Border responded by telling her "no" several times.

Officer Todd Harvey observed Border when he was brought to the second floor of the jail, which is where inmates are placed who are not deemed by a booking officer to be a suicide risk or otherwise require special monitoring. Officer Harvey observed that Border was steady on his feet, did not have difficulty walking, and was able to make his own bed. Thirty minutes later, Border requested an unoccupied cell. Officer Harvey denied the request, and recalls that during his conversation with Border, Border did not appear to complain of a medical problem, nor did he have trouble breathing or speaking.

Throughout the evening of Border's death, various corrections officers conducted hourly "watch tours." The purpose of these watch tours was to ensure that inmates were safe, to provide medical treatment to inmates if necessary, to respond to inmate concerns, and to ensure that all inmates were counted and present. . . . None of these officers reported any evidence or personal awareness that Border was experiencing any medical condition other than appearing intoxicated.

* * *

Inmate Gary Smith, who was in the same pod with Border, recalls that Border was slumped over as he entered the pod and his eyes were "red/glazed." Inmate Lewis Moler describes Border's breathing as labored, and observed that Border's condition got worse as the evening went on. Smith recalls that at approximately 9:10 p.m., Border lost control of his bladder. Smith states that when this was brought to the

attention of a corrections officer by another inmate, the unidentified officer responded by saying, "f- - - him."

Lewis Moler also states, without identifying the individuals by name, that at some point during the evening the "nurse" told a C.O. that Border was "messed up." According to Moler, the corrections officer responded by saying Border "came in drunk" and that he would "sleep it off." Finally, Lewis Moler recalls that he witnessed inmate Gary Smith tell an unidentified corrections officer, over an intercom, that Border couldn't breathe. Moler states, "[t]he C.O. told Gary they can't do anything until 6:00 [a.m.]."

**C. Death**

Border was found dead in his pod around 5:30 a.m. on the morning of January 13, 2008. As soon as jail staff learned Border had stopped breathing, they immediately responded and attempted to resuscitate Border. The coroner later concluded that Border died of acute polydrug intoxication by consuming excessive amounts of drugs including oxycodone, methadone, citalopram, and benzodiazepines.

(Citations omitted.)

In December 2008, Border's parents, Daniel and Diane Border ("plaintiffs"), initiated the present suit, asserting a deprivation of their son's constitutional rights under 42 U.S.C. § 1983, including violations of the Eighth and Fourteenth Amendments to the U.S. Constitution, wrongful death, and other state law claims. The named defendants included the City of Cortland and its officers who arrested the decedent, and Trumbull County and its sheriff, wardens, correctional officers, and medical personnel who interacted with the decedent during his incarceration at the Trumbull County Jail. In April 2009, plaintiffs amended their complaint to add Officer Palumbo as a defendant, alleging that he was one of the Trumbull County correctional officers who was deliberately indifferent to the decedent's serious medical needs during and after his booking at the Trumbull County Jail.

In July 2009, the City and County individual defendants filed motions for summary judgment, asserting qualified immunity from suit. On July 21, 2009, counsel for the County defendants sent a letter to plaintiffs' counsel, notifying them that "[w]e recently learned that Correction Officer Michael Palumbo, who booked [the decedent] into the Trumbull County Jail . . . on January 12, 2008, made unauthorized changes to Mr. Border's Jail booking record in April 2009." According to the letter,

> (1) On Mr. Border's "Medical Observation" form, which was completed by Mr. [Palumbo] on January 12, 2008, it is noted at item number four (4) that Mr. Border does not appear to be "under the influence of barbiturates, heroin, or other drugs." However, in April 2009, Mr. Palumbo changed Mr. Border's "Medical Observation" form to indicate that Mr. Border appears to be "under the influence of barbiturates, heroin, or other drugs."
>
> (2) On Mr. Border's "Medical Questionnaire" form, which was completed by Mr. Palumbo on January 12, 2008, it is noted at item number nine (9) that Mr. Border has not "fainted or had a head injury recently." However, in April 2009, Mr. Palumbo changed Mr. Border's "Medical Questionnaire" form to indicate that Mr. Border "fainted or had a head injury recently."
>
> As a result of the referenced changes to Mr. Border's Jail booking record by Mr. Palumbo, it is our understanding that the Trumbull County Prosecutor's Office is seeking a criminal indictment against Mr. Palumbo. [1]

---

[1]As a result of the ensuing criminal investigation into Officer Palumbo's alteration of the decedent's medical forms, Officer Palumbo was charged criminally and terminated from his position with the County.

Following a period of limited discovery,[2] the district court issued an Opinion and Order

granting in part and denying in part the summary judgment motions filed by the individual

defendants. The district court held, in relevant part, that Officer Palumbo was not entitled to

qualified immunity at this stage of the proceedings:

> [T]he actions of Officer Michael Palumbo are distinct from actions of the other
> defendants in this case. Plaintiffs have put forth unchallenged evidence that Officer
> Palumbo altered jail records fifteen months after he booked Border into the Trumbull
> County Jail. According to a letter from counsel for Trumbull County, Officer
> Palumbo failed to note on a "Medical Observation form" that Border appeared to be
> under the influence of "barbiturates, heroin or other drugs," but later altered the
> records to indicate that Border did appear to be under the influence of these
> substances.
>
> While it is by no means conclusive that Officer Palumbo committed any wrong
> doing, these facts must be viewed in the light most favorable to Plaintiffs, and call
> into question whether Officer Palumbo was aware that Border had taken prescription
> medication, and whether he had knowledge that he should have communicated to the
> nurse, or otherwise sought medical care for Border. If so, Officer Palumbo was
> deliberately indifferent to Border's medical care, thus violating Border's Fourteenth
> Amendment Rights. Furthermore, a reasonable public official would have been
> aware that withholding such information violated Border's constitutional rights.
> Officer Palumbo is, therefore, not entitled to qualified immunity as a matter of law.

It is the district court's denial of qualified immunity to Officer Palumbo that is the subject of this

interlocutory appeal.

## II.

---

[2]The district court stayed all discovery "except that limited discovery may be conducted where necessary to resolve the issue of qualified immunity." The court denied plaintiffs' request to depose Officer Palumbo at that juncture.

42 U.S.C. § 1983 "serves as a vehicle to obtain damages caused by persons acting under color of state law whose conduct violates the U.S. Constitution or federal laws." *Waeschle v. Dragovic*, 576 F.3d 539, 543 (6th Cir. 2009). The defense of qualified immunity "'protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Id*. (quoting *Pearson v. Callahan*, — U.S. — , 129 S. Ct. 808, 815, 172 L. Ed. 2d 565 (2009) (citation and internal quotation marks omitted)).

"Because a plea of qualified immunity can spare an official not only from liability but from trial, [the courts] have recognized a limited exception to the categorization of summary judgment denials as nonappealable orders [under 28 U.S.C. § 1291]." *Ortiz v. Jordan*, — U.S. — , 131 S. Ct. 884, 891 (2011) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 525-26 (1985)). An immediate appeal may be pursued, so long as the appeal presents a "'purely legal issue.'" *Id*. (quoting *Johnson v. Jones*, 515 U.S. 304, 313 (1995)). "This jurisdictional limitation requires that, if the defendant disputes the plaintiff's version of the story, the defendant must nonetheless be willing to concede the most favorable view of the facts to the plaintiff for purposes of the appeal." *Moldowan v. City of Warren*, 578 F.3d 351, 370 (6th Cir. 2009) (citation and internal quotation marks omitted). Thus, we have jurisdiction to consider whether the plaintiffs' facts, admitted by defendant Palumbo for purposes of this interlocutory appeal, show a violation of clearly established law. *Bishop v. Hackel*, — F.3d — , 2011 WL 291951, at *4 (6th Cir. Feb. 1, 2011); *Chappell v. City of Cleveland*, 585 F.3d 901, 906 (6th Cir. 2009); *Harris v. City of Circleville*, 583 F.3d 356, 364 (6th Cir. 2009).

"When no facts are in dispute, whether an official receives qualified immunity is a question of law" which we review de novo. *Harris*, 583 F.3d at 364. Plaintiffs bear the burden of demonstrating that a defendant is not entitled to qualified immunity. *Binay v. Bettendorf*, 601 F.3d 640, 647 (6th Cir. 2010); *Chappell*, 585 F.3d at 907. A defendant "'enjoys qualified immunity on summary judgment unless the facts alleged and evidence produced, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that: (1) the defendant violated a constitutional right; and (2) the right was clearly established.'" *Jefferson v. Lewis*, 594 F.3d 454, 459 (6th Cir. 2010) (quoting *Morrison v. Bd. of Trustees of Green Twp.*, 583 F.3d 394, 400 (6th Cir. 2009)). In determining whether the requisite showing has been made, the court has discretion to decide which of these two elements to address first in light of the particular circumstances. *Jefferson*, 594 F.3d at 460 (citing *Pearson*, 129 S. Ct. at 818); *Jones v. Byrnes*, 585 F.3d 971, 975 (6th Cir. 2009).

It is well-established that the Eighth Amendment's prohibition of cruel and unusual punishment provides the basis to assert a claim, under 42 U.S.C. § 1983, of deliberate indifference to a prisoner's serious medical needs; a similar claim brought on behalf of a pretrial detainee is equally viable under the Due Process Clause of the Fourteenth Amendment. *Phillips v. Roane Cnty., Tenn.*, 534 F.3d 531, 539 (6th Cir. 2008). "Prison officials' deliberate indifference violates an inmate's rights '[w]hen the indifference is manifested by . . . prison guards in intentionally denying or delaying access to medical care' for a serious medical need." *Id.* (quoting *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976)).

A constitutional claim for deliberate indifference to serious medical needs has both objective and subjective components:

> The objective component requires a plaintiff to show the existence of a sufficiently serious medical need. We have previously explained that where a plaintiff's claims arise from an injury so obvious that even a layperson would easily recognize the necessity for a doctor's attention, . . . it is sufficient to show that he actually experienced the need for medical treatment, and that the need was not addressed within a reasonable time frame. In contrast, the subjective component requires a plaintiff to allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk. Although the latter, subjective standard is meant to prevent the constitutionalization of medical malpractice claims, a plaintiff need not show that the officer acted with the specific intent to cause harm. Indeed, deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk. Officials, of course, do not readily admit this subjective component, so it [is] permissible for reviewing courts to infer from circumstances evidence that a prison official had the requisite knowledge.

*Phillips*, 534 F.3d at 539-40 (citations and internal quotation marks omitted).

"Deliberate indifference requires a degree of culpability greater than mere negligence, but less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Perez v. Oakland Cnty.*, 466 F.3d 416, 424 (6th Cir. 2006) (internal quotation marks omitted). Where a prison official actually knew of a substantial health risk to an inmate's health, he nonetheless may be free of liability if he reasonably responded to it, even though the harm ultimately was not averted. *Harrison v. Ash, C.O.*, 539 F.3d 510, 519 (6th Cir. 2008) (citation omitted).

In the present case, defendant Palumbo argues that the undisputed facts show that he was not deliberately indifferent to Border's serious medical needs because there was no indication, when Border arrived, that he had overdosed on drugs and, in any event, Palumbo referred him to the

medical assistant, Noreen Whitlock, who then evaluated Border and determined that there was no medical emergency. Thus, Palumbo asserts, his after-the-fact alteration of the jail records is not relevant to the issue of qualified immunity. We disagree.[3]

The jail policies and procedures in place when Border was incarcerated provided training for all corrections officers on subjects including the supervision and health screening of prisoners, substance abuse, abnormal behavior, and the identification of new inmates who might be intoxicated or overdosing on drugs. When booking a detainee into the jail, corrections officers were to thoroughly screen and evaluate the detainee through questioning and visual observation for physical or psychological problems, and to document the health history on various jail medical questionnaires and forms. If, during the booking process, an officer determined that a detainee was intoxicated or overdosing on drugs, the officer was required to immediately contact medical personnel for the purpose of evaluating the individual and providing medical treatment, if necessary. If a detainee advised personnel during his incarceration that he required medical treatment, or if an officer observed that an inmate required medical treatment, treatment was to be provided as expeditiously as possible. Specifically, if a corrections officer observed or discovered that an inmate was

---

[3]*Cf. Everson v. Calhoun Cnty.*, No. 09-2183, 2011 WL 204453, at *3 (6th Cir. Jan. 24, 2011) (unpublished) (holding in § 1983 action alleging that the plaintiff was arrested in retaliation for the lawful exercise of her First Amendment rights following her complaints about her ex-boyfriend, a city police officer, that a genuine issue of material fact existed regarding whether investigating officer intentionally changed a witness's statement in his police report or influenced the content of a second witness's statement, thereby precluding summary judgment on qualified immunity grounds).

exhibiting symptoms of a drug overdose, "medical treatment will immediately be provided to the inmate, and an emergency medical squad will be contacted."

The evidence viewed in the light most favorable to plaintiffs shows that upon his arrest, Border was visibly intoxicated, his eyes were glazed, his speech was slurred, and his coordination and balance were compromised. He had difficulty keeping his head up and maintaining consciousness.

Palumbo booked Border into the jail at 6:45 p.m. on January 12, 2008. As part of the booking process, Palumbo was to complete a "Medical Observation sheet." Palumbo complied with this policy requirement – with an unusual twist. At the time of Border's booking, Palumbo noted on the "Medical Observation" and "Medical Questionnaire" forms that Border did *not* appear to be under the influence of drugs or suffering from a head injury. However, it is undisputed that fifteen months after Border's death, Palumbo altered the medical forms to indicate that Border did in fact appear to be "under the influence of barbiturates, heroin, or other drugs," and that Border "fainted or had a head injury recently" at the time of his booking.

At her deposition, medical assistant Noreen Whitlock testified that she first saw Border on the night in question "[w]hen [she] got called over to booking for his head [wound]." The extent of her conversation with Palumbo was that "he called and said that he had someone over there with a head injury and needed me to come look at him." Whitlock cleaned the "small little nick" on the back of Border's head, applied antibiotic ointment, and gave him an ice pack. She asked him whether he had ingested anything, and he responded that he had consumed alcohol, but did not state

the quantity. She did not recall smelling the odor of alcohol on Border's breath, but noticed that his eyes appeared reddened and discolored. Palumbo was present while Whitlock treated Border, but he said nothing to her regarding Border's general medical condition or his possible ingestion of drugs. Whitlock did not have the opportunity to observe Border while he was walking or standing because he remained seated during her visit. Whitlock then left the room and returned to the medical department to prepare for her evening rounds at the jail. She testified that when she was in the booking room with Border, there was no reason to believe that there was any type of medical emergency.

At 8:00 p.m., Palumbo escorted Border to the second floor and placed him in a jail pod with several other inmates. One of the inmates stated in an affidavit that when Border arrived in the pod, he was physically unable to carry his own belongings. Border was "huddled and slumped over, [and] his eyes were red/glazed." Another inmate averred that Border had difficulty walking and staying awake upon his arrival. A third inmate described Border as uncoordinated, slurring his speech, nodding out, and hallucinating during their conversations. When Whitlock next saw Border during her "med pass," which ordinarily started at 8:00 p.m., he was having difficulty making his bed and appeared to be intoxicated and uncoordinated.

A plaintiff's assertion that officers should have known that a pretrial detainee had ingested drugs does not suffice to establish a claim of deliberate indifference. *Weaver v. Shadoan*, 340 F.3d 398, 411 (6th Cir. 2003); *Watkins v. City of Battle Creek*, 273 F.3d 682, 686 (6th Cir. 2001). "When dealing with medical care for detainees, negligence does not state a cause of action under § 1983."

*Weaver*, 340 F.3d at 411. Thus, a pretrial detainee's generalized state of intoxication, without more, is insufficient to establish a serious medical need or an officer's deliberate indifference to a substantial risk of serious harm to a detainee. *See Meier v. Cnty. of Presque Isle*, 376 F. App'x 524, 528-29 (6th Cir. 2010) (unpublished) (holding that detainee's intoxication alone did not put officers and jail officials on notice that detainee, who lapsed into a coma from a head injury, needed medical attention, where the detainee cooperated, communicated effectively, and walked unassisted); *Spears v. Ruth*, 589 F.3d 249, 255-56 (6th Cir. 2009) (holding that there was no evidence that the defendant police officer was aware of facts from which an inference could be drawn that a substantial risk of serious harm existed to the pretrial detainee, who died from smoking crack cocaine, or that the officer drew that inference and chose to disregard the risk, for purposes of a claim of deliberate indifference to serious medical needs); *Smith v. Pike*, 338 F. App'x 481, 482 (6th Cir. 2009) (unpublished) (holding that defendants were entitled to qualified immunity because "[t]he evidence does not establish that jail officials were aware that [the detainee who died from drug overdose] had a sufficiently serious medical need or that they acted in conscious disregard by refusing medical care[;] [a]lthough [the detainee] was clearly intoxicated, jail personnel had no indication that she was experiencing an overdose, and she did not appear to exhibit symptoms that would make it objectively clear that she had overdosed or was in immediate need of medical attention"); *Weaver*, 340 F.3d at 410-12 (holding that police officer was not deliberately indifferent to the medical needs of pretrial detainee, who died in custody from a drug overdose, where the officer did not have knowledge that the detainee ingested cocaine and the detainee repeatedly denied swallowing drugs); *Watkins*, 273

F.3d at 685-86 (holding that arresting officers and jail personnel were not deliberately indifferent to a pretrial detainee's rights in violation of the Fourteenth Amendment, where the detainee, who appeared to be drunk or high when he arrived at the jail, repeatedly denied that he had ingested cocaine and refused medical treatment, but died approximately three hours after his arrival); *Estate of Abdel-Hak v. City of Dearborn*, 872 F.2d 1023, 1989 WL 33097, at *2 (6th Cir. 1989) (unpublished table decision) (finding no deliberate indifference on the part of police officers "because [they] had no way of knowing that decedent was under the influence of cocaine" when he arrived at the police station and the decedent's friend "did not inform the officers that plaintiff had been ingesting cocaine, but merely told them that he was drunk").

In the instant case, however, viewing the evidence in the light most favorable to plaintiffs, Palumbo's notation on the altered forms that Border appeared to be "under the influence of barbiturates, heroin, or other drugs" and suffered a recent head injury, coupled with Border's signs of physical incapacity, severe intoxication and obvious disorientation witnessed by the inmates during the time period that Palumbo was interacting with Border, sufficiently establish from an objective standpoint that a serious medical need existed and, in addition, that a reasonable jury could conclude that Palumbo was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed] and [he] ignored that risk." *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 899 (6th Cir. 2004).

"[C]orrectional officers may not escape liability if the evidence showed that [they] merely refused to verify underlying facts that [they] strongly suspected to be true, or declined to confirm

inferences of risk that [they] strongly suspected to exist." *Phillips*, 534 F.3d at 541 (citation and internal quotation marks omitted). *See Preyor v. City of Ferndale*, 248 F. App'x 636, 642 (6th Cir. 2007) (unpublished) (holding that a serious medical need was demonstrated where the detainee, a diabetic who died in custody from heroin withdrawal, vomited, suffered bouts of diarrhea causing dehydration, was seen lying on the cell floor, and told officers that he was not feeling well and believed he was detoxing from heroin).

Contrary to Palumbo's assertion, the fact that he called the on-duty medical staff member, Noreen Whitlock, who then treated Border, does not relieve Palumbo of liability under these particular circumstances. Whitlock was not a nurse or trained emergency medical technician ("EMT"), but rather an unlicensed medical assistant. She had only a brief encounter with Border, and responded to Palumbo's narrow request that Border be treated for a minor cut on his head. Despite Border's intoxicated state and Palumbo's apparent recognition that Border was under the influence of drugs, Palumbo did not mention this to Whitlock. Whitlock observed Border very briefly, while he was seated and inactive, and she cleaned and bandaged his head, but otherwise did not medically examine Border to ascertain his medical condition.

These circumstances serve to distinguish the present case from *Spears v. Ruth*, in which we held that an arresting police officer was not deliberately indifferent to the medical needs of a pretrial detainee, who died of a cocaine overdose, because there was no evidence to sustain the necessary inference that a substantial risk of serious harm existed, or that the officer drew that inference and chose to disregard the risk. *Spears*, 589 F.3d at 255. At the time of his arrest, the detainee was

acting in a bizarre manner, but he was examined by trained EMTs at the scene, who decided not to take him to the hospital. *Id*. at 252. At the jail, a nurse conducted a second medical examination and likewise concluded that the detainee did not need to be transported to the hospital. *Id*. We held that, although the officer admitted that the detainee told him that he had smoked crack cocaine, the officer's failure to convey this fact to the EMTs and nurse "was at worst negligen[ce]," and the officer was "entitled to rely on the EMT's and the jail nurse's assessments that [the detainee] did not need to be transported to the hospital." *Id*. at 255. *See also Weaver*, 340 F.3d at 412 (holding that police officer was not deliberately indifferent to the medical needs of a pretrial detainee who died in custody after ingesting a lethal dose of cocaine, where the officer lacked knowledge that the detainee had ingested cocaine, he immediately summoned paramedics at the first sign of illness, checked the detainee's heartbeat and breathing, which were normal, and the paramedics' report indicated a lack of symptoms of drug ingestion); *Meier*, 376 F. App'x at 529 (holding that booking officer did not act with deliberate indifference to the medical needs of the intoxicated detainee, who unbeknownst to the officer had suffered a head injury, where the officer complied with the unwritten policy of calling physician for consultation and followed the physician's instructions to monitor the detainee rather than transfer him to a medical facility).

By contrast, in the case at hand, Border was treated cursorily by an unlicensed medical assistant for a minor cut on his head. Despite Border's obvious intoxication and Palumbo's apparent knowledge that he was under the influence of drugs, Palumbo never informed Whitlock of these facts. Further discovery may shed light on Palumbo's actions. However, at this point in the case,

plaintiffs' evidence adequately demonstrates that Palumbo was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed] and [he] ignored that risk." *Blackmore,* 390 F.3d at 899. We agree with the district court that, although it is by no means conclusive that Palumbo committed any wrong doing, the facts viewed in the light most favorable to plaintiffs "call into question whether Officer Palumbo was aware that Border had taken prescription medication, and whether he had knowledge that he should have communicated to the nurse, or otherwise sought medical care for Border. If so, Officer Palumbo was deliberately indifferent to Border's medical care, thus violating Border's Fourteenth Amendment [r]ights."

Because a genuine issue of material fact exists regarding whether Palumbo acted with deliberate indifference to Border's serious medical needs, we conclude that the district court properly denied summary judgment to Palumbo on the basis of qualified immunity.

III.

For the reasons set forth above, the judgment of the district court is affirmed.