**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a0966n.06

**No. 11-3775**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

**Aug 31, 2012**

LEONARD GREEN, Clerk

|  |  |  |
|---|---|---|
| CAROL STEFAN, Executor of the Estate of Michael P. Reid, | ) ) ) | |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) ) | On Appeal from the United States District Court for the Northern District of Ohio |
| ED OLSON, et al., | ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| JENNIFER MCCUNE, | ) ) | |
| Defendant-Appellant. | ) | |

Before:       BOGGS and WHITE, Circuit Judges; and BLACK, District Judge.*

        BOGGS, Circuit Judge.  Jennifer McCune, a nurse,  appeals the district court's denial of her motion for summary judgment based on qualified and sovereign immunity for her role in the death of a pre-trial detainee during her employment at the Richland County Jail in Mansfield, Ohio.  For the reasons that follow, we affirm.

**I**

---

        *Hon. Timothy S. Black, United States District Judge for the Southern District of Ohio, sitting by designation.

The facts of this case are both tragic and relatively straightforward. Michael Reid suffered from chronic alcoholism throughout his adult life, experiencing periods of both sobriety and alcohol abuse. On February 25, 2009, less than a month after pleading guilty to resisting arrest and being placed on probation, Reid violated his probation terms by consuming alcohol. Reid then failed to appear at his probation-violation hearing on March 6, 2009, and the Mansfield, Ohio, Municipal Court issued a warrant for his arrest.

On April 2, 2009, Reid's assigned probation officer directed three fellow probation officers to arrest Reid, informing them that Reid was "prone to have seizures" when he stops drinking. The officers arrested Reid without incident at his parents' home. Reid admitted that he had consumed alcohol all day and was intoxicated but complied with the officers' instructions. Prior to their departure, Reid's father warned the probation officers "that he would seizure," and the probation officers assured him that they would relay that information to personnel at the jail.

En route to the jail, Reid registered a blood-alcohol level of .349 percent on a portable intoxilizer, over four times the legal limit. Reid advised the officers of his history of seizures when he stopped drinking and told them several times to make the jail staff aware. After arriving at Richland County Jail, the probation officers did tell the corrections officers of Reid's dangerously high blood-alcohol level and propensity for seizures during detoxification. Upon hearing this information, the presiding corrections officer, Lt. James Myers, was reluctant to admit Reid and asked jail employee Nurse Jennifer McCune to conduct a medical evaluation. McCune is a Licensed Practical Nurse and is certified as an entry-level Emergency Medical Technician (EMT-Basic).

When Lt. Myers first advised McCune of Reid's .349 blood-alcohol level, she said that the jail should probably not admit Reid.[1]  McCune initially observed that Reid had a racing pulse, was dehydrated, and needed to go to the hospital.  However, during the evaluation, Reid  was "not leaning or swaying or falling" and his speech was not slurred.  McCune also took his blood pressure, which she recorded as "within normal limits."  Reid was coherent and conversational with the staff, even joking during the evaluation.  However, Reid expressed a desire to go to the hospital because he was drunk and had high blood pressure.

Had McCune checked the jail's computer record system, she likely would have found four medical files for Reid from previous incarcerations.  These medical reports detailed that Reid was a chronic alcoholic and had a history of seizures due to alcohol withdrawal.  McCune explained that she had no reason to check the medical records, based on the fact that Reid did not mention his previous incarcerations during the evaluation.  However, during the course of the medical evaluation Reid told McCune that he had a history of alcoholism, that he would suffer withdrawal, and that he had a history of seizures during withdrawal.  McCune responded, "When it starts, we will be there for you."

After completing the evaluation, McCune changed her initial assessment and approved Reid for admission to the jail.  She then deferred to Lt. Myers on the decision of whether to accept Reid into the jail.  However, McCune noted that "if we keep him . . . he will go thru [*sic*] withdrawal and

---

[1] While it is certain that the probation officers told the corrections officers that Reid was prone to seizures, it is unclear whether Lt. Myers or any other corrections officer relayed this information directly to McCune.

we will treat him here."[2]  According to Probation Officer (P.O.) Denise Stryker, McCune advised the arresting probation officers that the jail would keep Reid and "start [him] on meds to help him." Based on McCune's assessment of Reid as stable, Lt. Myers accepted Reid into the jail.

When Reid was booked into the jail at 8:02 p.m., he reported to the booking officer that he had delirium tremens.  Lt. Myers clarified that Reid was not experiencing delirium tremens at the time but was merely indicating a history with the condition.  Lt. Myers elaborated that this fit with the jail's understanding that "when [Reid] came in . . . he was *going to go through* withdrawals." (emphasis added).  While McCune did not see this report or discuss it with any of the corrections officers, at one point following the check-in, Reid again told McCune that "I will have seizures if I withdraw." McCune responded:  "[W]e will take *all* precautions," and noted that if Reid showed any signs of withdrawal, she would start him on medication.  (emphasis added).

The record shows that no medication was ever given to Reid.  McCune understood that medication was not to be administered prophylactically but instead should be administered once signs of withdrawal began.  However, this understanding and inaction directly contradicted the written jail protocol, which requires that the evaluating nurse administer seven separate medications at specified dosages and intervals.  Dr. Williams, the jail physician and author of the withdrawal

---

[2] There is a discrepancy in the record concerning this observation.  While McCune recorded the observation in her medical progress notes, she contends that she did not know for certain that Reid would withdraw.  Rather, she understood withdrawal to be an indefinite, person-by-person experience and did not know if or when Reid would suffer withdrawal.  McCune explained the notation as a "standard of saying that if an alcoholic goes through withdrawal, then we treat them," and not a firm prediction of Reid's imminent withdrawal.  Plaintiff cites this statement as evidence that McCune knew Reid would experience withdrawal.  Appellee Br. at 21.

protocol, said that the medications should have been given "certainly by the first hour" after medical evaluation and could not explain why McCune did not do so.[3] McCune also believed that she was required to obtain authorization from Dr. Williams prior to dispensing medication.[4] McCune testified:

> A. You don't need to call [the doctor] until [the inmate] exhibits signs and symptoms of withdrawal.
> Q. Okay. And that was the policy in place here at Richland County? You wait for the patient to start going through withdrawal before you start treating?
> A. Yes.
> Q. Did you ever call Dr. Williams with regard to Michael Reid on April 2nd?
> MR. DOWNEY: Objection.
> Q. You can answer.
> A. I can't accurately say.

But Dr. Williams stated that the nurses did not have the discretion *to withhold medications* without first calling him. Dr. Williams also agreed "that an inmate who is highly intoxicated and has a history of seizures during alcohol withdrawal has a serious medical need which jail guards and nursing staff should never deliberately disregard."

---

[3] There is conflict in the record on this point. While Dr. Williams testified that the protocol required prophylactic medication, both McCune and her supervisor, Nurse Fogle, stated that their understanding and practice was to give medication once withdrawal began. Fogle affirmed this approach when McCune called her to give information about Reid. During this call, Fogle also confirmed that thirty-minute checks and the cell assignment were appropriate. The record does not suggest that McCune told Fogle about Reid's warnings about seizures.

[4] This interpretation is contradicted by the testimony of Nurse Fogle that McCune was authorized to initiate the protocol without first speaking to Dr. Williams if she observed symptoms of withdrawal in Reid. Nevertheless, because McCune did not observe any signs of withdrawal, there is no evidence in the record that she called Dr. Williams that evening.

In any event, regardless of when the medication should have been administered, the jail did not have the necessary withdrawal medications on hand. The officer in charge of the jail, Major Paxton, stated that the medications were ordered on an individual basis from a local pharmacy. In the event that an inmate began to experience withdrawal overnight, the on-call nurse might come in to make an evaluation or direct the corrections officers to send the inmate to the hospital. If the on-call nurse determined that the inmate could remain at the jail, the medication would be ordered when the local pharmacy opened that morning and delivered at some point afterwards. Thus, once McCune left for the evening, the jail possessed neither the medication nor personnel to administer the withdrawal protocol if Reid began to exhibit withdrawal symptoms, as he said he would. Dr. Williams believed that the protocol medications were in stock at the jail and testified that it would be "impossible" to comply with the protocol during the night shift if they were not.

Around 9:00 p.m., McCune instructed Lt. Myers and Corrections Officer (C.O.) Tina Mahon to keep Reid in cell 1B15 on thirty-minute checks "due to his high level of alcohol and *because of his seizures*." Cell 1B15 consists of concrete and cinder-block walls and floor and contains a concrete or cinder-block toilet partition and a concrete bed. McCune chose cell 1B15 because it was close to the book-in station and was equipped with a camera[5] "so that *if he did have a seizure*, it

---

[5] While the camera captured footage of Reid from the time he was placed in the cell, all but the 10 minutes before and after Reid's fall was erased shortly after the incident. The jail offered no explanation as to why the footage was erased.

would be noted and action could be taken immediately." (emphasis added). Reid was also given

a mat for the bunk when he was placed in the cell.[6]

Prior to leaving the jail around 9:30 p.m., McCune instructed the corrections officers to

continue thirty-minute checks on Reid until the following day and to call Nurse Fogle, the on-call

nurse, if Reid showed withdrawal symptoms overnight. McCune told them to "[j]ust keep an eye

on him." Although they were not trained in alcohol-withdrawal monitoring, C.O. Mahon and Lt.

Myers understood that they were to look for outward signs of withdrawal, including shaking,

tremors, sweating, or sickness.[7] McCune also instructed that Reid be given a bottom bunk "due to

his condition" when he was admitted to the general population. At this point, McCune took Reid's

vital signs, again finding that he was stable and exhibited no signs of withdrawal.

The jail log indicates that corrections officers observed Reid through the window in his cell

at 30-minute intervals beginning at 10:00 p.m. However, with a few limited exceptions, the officers

---

[6] With respect to the mat, McCune contradicted herself and the rest of the record. McCune stated that she instructed that Reid be given *a mat* for safety reasons, including laying it on the floor for padding. However, McCune also stated that she ordered *extra sleeping mats* to be placed in the cell as a "significant safety precaution . . . so that if he was to fall, that it would cushion him." McCune testified that the placement of the additional mats was the responsibility of a corrections officer and that she observed the additional mats when she attended to Reid in the cell. This deposition testimony contradicts McCune's notes instructing the corrections officers to "make sure he gets *a mat*." (emphasis added). Ultimately, two considerations are present. First, the jail's standard practice was to issue a single mat to all inmates once they have been processed. Thus, McCune's request for *a mat* was not an "extraordinary accommodation" attributable to medical or safety precaution. Second, Nurse Fogle, Lt. Myers, and the video of the incident all reveal that only one mat was in Reid's cell.

[7] Myers testified that there was no requirement to look for vomit or diarrhea or to engage the inmate in conversation or enter the cell. Mahon did look for vomit, but she left at 10:00 p.m.

did not speak to Reid or enter his cell. They did not at any point check his vitals or look inside his cell for signs of withdrawal (vomit, for example). Rather, the checks consisted of "[t]he officer . . . walk[ing] over here and look[ing] in the window and com[ing] back and log[ging] it into the computer system." Lt. Myers said the goal of the checks was to "[m]ake sure that [Reid was] breathing and not having any problems." Lt. Myers's only conversation with Reid came just before Myers left at 1:30 a.m., when Reid asked to have his blood pressure taken. Lt. Myers told him that "the nurse would be in in a couple hours to check him." According to Dr. Williams, these practices were insufficient to properly care for an inmate who might go through withdrawal. He testified that the 30-minute checks for a detainee like Reid should have involved entering the cell, interviewing the inmate for signs of withdrawal, and taking vital signs. Furthermore, the correct method of checking for tremors involved standing directly in front of the inmate and watching for shaking as the inmate extended his hands toward the examiner. The checks following McCune's departure for the evening did not accomplish these tasks. McCune's deposition testimony about the adequacy and communication of her instructions is unclear.

> Q. Is the particular corrections officer on duty who is responsible for watching the video monitor every 10, 15 minutes given any specific details to look out for?
> A. Yes. They're told specifically what is—why they're in watch.
> Q. Okay. And what things would the corrections officer be told when we're talking about now Michael Reid?
> A. This patient is on watch and could possibly exhibit signs and symptoms of withdrawal. And I am only summarizing what could have been said because I don't have my—anything in front of me to tell me exactly what I said.
> Q. Would you have written down somewhere what you would have told the corrections officer?

A. Sometimes. I can't tell you specifically if I wrote that down.
. . .
Q. Did you ever have a discussion with Lieutenant Myers in terms of
what to keep an eye out for with regard to Michael Reid?
A. I can't accurately say what my explicit details of the conversation
were.

Nurse Fogle arrived for her shift at around 5:15 a.m., on April 3. Fogle testified that it was her custom to check the jail's computer records for inmates with whom she was not familiar. Because of the call from McCune the evening before and the verbal report she received when she arrived at the jail, Fogle accessed Reid's records at the beginning of her shift. The records revealed that Reid had been in the jail before and that the doctor had twice ordered partial protocols for alcohol withdrawal. Furthermore, a full protocol was ordered for Reid at one point but not administered to Reid before he was released. Understanding that the alcohol-withdrawal protocol could be administered if Reid displayed symptoms, Nurse Fogle determined that a physical and visual evaluation would be necessary to discern if Reid was going through withdrawal. Nurse Fogle checked Reid on the video monitor three times, each time observing that he was sleeping. She did not want to disturb him, so she let him sleep.[8]

At 8:29 a.m., Reid stood up and pressed the call buzzer in his cell several times to request assistance. While Reid stood at the buzzer, he suffered a violent seizure and struck his head on the concrete bunk as he fell to the ground. The impact was severe, causing a bursting laceration to the

---

[8] The only documented entrance into Reid's cell occurred when C.O. Carla McManama, one of the correction officers on duty that morning, delivered Reid's breakfast tray at 6:00 a.m. and then retrieved it at 6:45. C.O. McManama did not report to Nurse Fogle that Reid had not eaten the food and had complained of nausea.

right side of his head accompanied by profuse bleeding. C.O. Hicks, another on-duty correction officer, said "it sounded like a shot gun, it made so much noise." The single mat, situated on the bunk, did not provide any protection as Reid fell. The corrections officer seated at the check-in station watching the video monitor of Reid's cell immediately called the nurse's station for help and dialed 911. Nurse Fogle responded and entered Reid's cell for the first time during her shift.[9] Reid remained conscious while suffering excruciating pain as he was transported by ambulance to MedCentral Health System Mansfield Hospital.[10] Initial blood work at the hospital showed that Reid's blood alcohol had dropped to .099, over 71% lower than when he was admitted to the jail. Examination at the hospital revealed that Reid had a cerebral herniation, multiple hematomas, hemorrhaging, and contusions. Reid underwent an emergency craniectomy. However, Reid was pronounced brain dead and removed from life support five days later on April 8, 2009.

Reid's family, through his executor, filed suit against McCune, several other jail officials, and the county, alleging an infringement of Reid's constitutional rights protected under 42 U.S.C. § 1983, as well as claims of medical negligence and wrongful death under Ohio tort law. After initial discovery, each of the defendants filed a motion for summary judgment on the basis of

---

[9] At some point after entering Reid's cell, Nurse Fogle observed white vomitus in the toilet. In her deposition, Fogle stated that if someone had informed her Reid was vomiting, she would have gotten up and come in if she was not already at the jail. Nurse Fogle believed that vomitus could be a sign that the inmate was "starting into withdrawal." She also said that once withdrawal begins, alcoholics deteriorate rapidly.

[10] The Richland County Jail is situated in downtown Mansfield, Ohio, less than 1.5 miles from the MedCentral Health System Mansfield Hospital.

qualified immunity. The district court granted qualified immunity for each individual defendant except McCune, holding:

> Under the circumstances, a reasonable juror could find that placing Reid in an all concrete cell with one mat, knowing that he had a blood alcohol content of 0.349, knowing that he would not be drinking any alcohol for the next 10 to 12 hours, knowing that he would go through withdrawal, knowing that he had a history of withdrawal seizures, knowing that there would be no protocol medications at the jail and no one who could dispense them in any event, shows deliberate indifference to a known risk. There is evidence from which a jury could conclude that McCune made the decision to accept Reid at the jail, rather than directing the arresting officers to take Reid directly to the hospital, knowing that the jail had neither the medication nor the overnight personnel to follow the jail's own protocol to treat Reid. These facts, along with the testimony of the jail's Medical Director, Dr. Williams, could support a finding of deliberate indifference.

The district court also held that, for the same reasons, McCune was not immune under state law because sovereign immunity is not available to Ohio employees who act recklessly. McCune timely appealed.

## II

Generally, under 28 U.S.C. § 1291, a trial court's denial of summary judgment is not an appealable "final decision" subject to this court's jurisdiction. *Comstock v. McCrary*, 273 F.3d 693, 700 (6th Cir. 2001). However, the Supreme Court held in *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985), "that a district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291." Ten years later, the Court further clarified that, in the interest of appellate expertise and efficiency, jurisdiction

over a denial of summary judgment on a qualified immunity claim is limited "to cases presenting neat abstract issues of law." *Johnson v. Jones*, 515 U.S. 304, 317 (1995) (internal quotation marks omitted).

We recognize that the jurisdictional question tethered to the law-fact distinction can pose a conundrum to litigating parties, especially upon a cursory reading of the applicable case law. It is well settled that a denial of qualified immunity is not appealable on grounds of whether the record sets forth a genuine issue of fact for trial. *Id.* at 319–20. Nor can an interlocutory appeal of this nature challenge whether the evidence supports a finding that the alleged conduct actually occurred. *Id.* at 313. Rather, "[f]or appellate jurisdiction to lie over an interlocutory appeal, a defendant seeking qualified immunity must be willing to concede the facts as alleged by the plaintiff and discuss only the legal issues raised by the case." *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 549 (6th Cir. 2009) (internal quotation marks omitted). Furthermore, "'[a]n appellate court reviewing the denial of the defendant's claim of immunity need not consider the correctness of the plaintiff's version of the facts.'" *Johnson*, 515 U.S. at 313 (quoting *Mitchell*, 472 U.S. at 528).

For purposes of this appeal, McCune has properly conceded, both in her reply brief and at oral argument, that we must take the facts in the light most favorable to Stefan. Appellant Reply Br. at 13–14. She maintains that the conceded facts do not support the conclusion that she was "deliberately indifferent to [Reid's] medical needs." *Id.* at 1. Therefore, "the only 'facts' in dispute are the ultimate issues to be decided by applying law to the basic [and uncontested] facts." *Williams v. Mehra*, 186 F.3d 685, 690 (6th Cir. 1999) (en banc). Questions of a Defendant's specific conduct

are questions of basic fact, while the question of whether those actions could meet the legal standard for deliberate indifference is a mixed question of law and fact that we review *de novo* as a question of law. *See ibid*. Furthermore, contrary to Appellee's assertion, should factual or inferential disputes remain on appeal, this court may choose to address only the legal issues and thus avoid the need to dismiss the appeal for lack of jurisdiction. *See Bradley v. City of Ferndale*, 148 F. App'x 499, 505 (6th Cir. 2005).

"In considering a motion for summary judgment, we view the factual evidence and draw all reasonable inferences in favor of the non-moving party." *Dominguez*, 555 F.3d at 549. Therefore, the parties are reminded that "[w]hen no facts are in dispute, whether an official receives qualified immunity is a question of law." *Ibid*. Accordingly, we have jurisdiction in this case because "our decision turns on a question of law: whether the alleged facts, admitted for this purpose, show a violation of clearly established law." *Williams*, 186 F.3d at 690. We may reverse the denial of qualified immunity on summary judgement if "the evidence viewed in the light most favorable to the plaintiff fail[s] to establish a *prima facie* violation of clear constitutional law." *Berryman v. Rieger*, 150 F.3d 561, 563 (6th Cir. 1998).

### III

42 U.S.C. § 1983 provides that "[e]very person who, under color of any [state law or custom], subjects, or causes to be subjected, any citizen . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." However, the threshold for such liability is high. Immunity is available to government employees

performing discretionary functions as a wholesale shield to litigation unless: (1) "the plaintiff has alleged facts which . . . show that the defendant-official's conduct violated a constitutionally protected right";and (2) "that right was clearly established such that a reasonable official, at the time the act was committed, would have understood that his behavior violated that right." *Comstock*, 273 F.3d at 702 (citing *Saucier v. Katz,* 533 U.S. 194, 201 (2001)).

## A

It has long been established that, under the Eighth Amendment's prohibition against cruel and unusual punishment, prisoners have a constitutional right to medical care. *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976). This determination of a "sufficiently serious medical need is predicated upon the inmate demonstrating that he or she is incarcerated under conditions imposing a substantial risk of serious harm." *Miller v. Calhoun Cnty.*, 408 F.3d 803, 812 (6th Cir. 2005) (internal quotation marks omitted). Additionally, "'[t]he due process rights of a [pre-trial detainee] are at least as great as the Eighth Amendment protections available to a convicted prisoner.'" *Phillips v. Roane Cnty*, 534 F.3d 531, 539 (6th Cir. 2008) (quoting *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)); *see also Estate of Carter v. City of Detroit*, 408 F.3d 305, 311 (6th Cir. 2005).

While this right to medical care does not impose an affirmative duty on the government to screen detainees for all possible ailments, this court has "long held that prison officials *who have been alerted* to a prisoner's serious medical needs are under an obligation to offer medical care to such a prisoner." *Comstock*, 273 F.3d at 702 (emphasis added). "If a prisoner asks for and needs medical care, it must be supplied." *Danese v. Asman,* 875 F.2d 1239, 1244 (6th Cir. 1989). Failure

to provide medical treatment when circumstances clearly evince a need amounts to a deprivation of constitutional due process. *Dominguez*, 555 F.3d at 552.

"For the failure to provide medical treatment to constitute a constitutional violation, [the plaintiff] must show that the defendants acted with 'deliberate indifference to serious medical needs.'" *Id.* at 550 (quoting *Estelle,* 429 U.S. at 104). The test for deliberate indifference to a medical need is both objective and subjective. "The objective component requires a showing that the alleged deprivation is sufficiently serious—that [the detainee] was incarcerated under conditions posing a substantial risk of serious harm." *Garretson v. City of Madison Heights*, 407 F.3d 789, 796–97 (6th Cir. 2005) (internal quotation marks omitted). Furthermore, the risk must be "one which society deems so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk." *Talal v. White*, 403 F.3d 423, 426 (6th Cir. 2005) (internal quotation marks omitted). To satisfy the subjective component, the plaintiff must demonstrate that the defendant possessed "a sufficiently culpable state of mind in denying medical care." *Estate of Carter*, 408 F.3d at 311 (internal quotation marks omitted). This is the equivalent of showing that the "authorities knew of, and manifested deliberate indifference to, [the detainee's] serious medical needs." *Talal*, 403 F.3d at 426.

**1**

This court has described an objective medical need as "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008)

(internal quotation marks omitted).  Additionally, nurses are held to a higher level of responsibility to recognize medical needs and risks because of their training.  *Dominguez*, 555 F.3d at 550.  Construing the facts in favor of the Plaintiff, both of these standards have been satisfied.

The likelihood of Reid's withdrawal complications had been indicated by the jail doctor, as shown by the available medical records noting previous withdrawal protocols ordered for and administered to Reid.  Moreover, Reid's racing pulse, dehydration, and .349 blood-alcohol level, accompanied by verbal warnings of withdrawal and seizures, were sufficient to alert even a lay person, let alone a licensed practical nurse and EMT, that the detainee should see a physician.  In addition, Dr. Williams, the jail physician, agreed "that an inmate who is highly intoxicated and has a history of seizures during alcohol withdrawal has a serious medical need."

McCune's rebuttal, that Reid did not show an objective medical need during the two hours that she was with him, is unsupported by law and ignores relevant facts.  McCune cites *Border v. Trumbull Cnty. Bd. of Comm'rs*, 414 F. App'x 831, 837 (6th Cir. 2011), an unpublished Sixth Circuit case, for the proposition that "a pretrial detainee's generalized state of intoxication, without more, is insufficient to establish a serious medical need," Appellant Br. at 15.  However, Reid was not merely "in a generalized state of intoxication."  While the detainee in *Border* had no history of seizures that was documented or communicated to officials, Reid explicitly told McCune that he would likely have seizures, a propensity that McCune could have verified had she checked the jail's medical records.  The other cases that McCune cites are similarly inapposite, since they all involve

guards watching intoxicated inmates who did not have the history, warnings, and medical manifestations that Reid did.

Furthermore, McCune's analysis is incompatible with the overarching deliberate-indifference standard, which looks to the severity of the risk posed to the detainee instead of its temporal immediacy. "That the Eighth Amendment protects against future harm to inmates is not a novel proposition." *Helling v. McKinney*, 509 U.S. 25, 33 (1993). "[T]he Eighth Amendment protects against *sufficiently imminent dangers* as well as current unnecessary and wanton infliction of pain and suffering . . . . We thus reject [the proposition] that only deliberate indifference to current serious health problems of inmates is actionable under the Eighth Amendment." *Id.* at 34 (emphasis added). Reid's extremely elevated .349 blood-alcohol level and verbal communication of a history of alcoholism accompanied by withdrawal seizures communicated an objectively serious medical need possessing the "sufficiently imminent danger" that is "actionable under the Eighth Amendment."

**2**

The subjective component requires that the facts alleged by the plaintiff, if true, show that the official "subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Comstock*, 273 F.3d at 703 (citing *Farmer*, 511 U.S. at 837). At the same time, while officials may not deliberately disregard a medical need, "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 106. Specifically, "if the officers failed to act in the

face of an obvious risk of which they should have known but did not, then they did not violate the Fourteenth Amendment." *Garretson*, 407 F.3d at 797. Inadvertent failure or negligence in providing medical care does not rise to the level of a constitutional deprivation, as deliberate indifference "describes a state of mind more blameworthy than negligence." *Farmer*, 511 U.S. at 835.

Nevertheless, a plaintiff is not required to show that the official acted "for the very purpose of causing harm or with knowledge that harm will result." *Ibid.* Liability can be imposed "if he knows that inmates face a substantial risk of serious harm and disregards that risk by *failing to take reasonable measures* to abate it." *Id.* at 847 (emphasis added).

That McCune subjectively perceived facts from which to infer a substantial risk to Reid existed is clear. Lt. Myers told McCune about the high intoxilizer reading for Reid, at which point she thought the jail should probably not accept him. Although McCune later cleared Reid for admission, she initially observed that he had a racing pulse, was dehydrated, and needed to go to the hospital. Furthermore, Reid specifically requested to go to the hospital. During the initial medical examination, Reid told McCune that he had a history of alcoholism, that he would experience withdrawal, and that he had a history of seizures while going through withdrawal. McCune responded: "When it starts, we will be there for you." Finally, Reid told McCune again, prior to her departure, "I will have seizures if I withdraw." She quieted his fear again, responding that "we will take all precautions." All of this evidence shows that McCune knew the facts from which to infer a substantial risk.

McCune did not merely perceive these facts upon which to base the inference, but she also

made the logical connection, drawing the inference for herself that Reid was at substantial risk for a seizure and fall. In addition to her assurances in response to Reid's concern, McCune noted that "if we keep him . . . he will go thru [*sic*] withdrawal and we will treat him here." According to P.O. Stryker, McCune said that the jail would "start [Reid] on meds to help him." During McCune's final interaction with Reid, she even noted that if he showed any signs of withdrawal, she would start him on medication. Furthermore, McCune's knowledge of the risk is evident from the instructions she gave for his treatment "due to his high level of alcohol and *because of his seizures*." (emphasis added). She also instructed that Reid be given a bottom bunk "due to his condition" when he was admitted to the general population. Finally, McCune stated that she ordered *extra sleeping mats* to be placed in the cell as a "significant safety precaution . . . so that if he was to fall, that it would cushion him." Therefore, McCune drew the inference that Reid was at a substantial risk for a seizure and an accompanying fall.

The determination of qualified immunity thus turns on whether McCune's actions rose above the level of ordinary negligence into reckless disregard. The district court's opinion denying qualified immunity was sweeping in its inclusion of many reasons that a reasonable jury could find that McCune acted with deliberate indifference. Even if each reason was not itself valid, we agree that a reasonable jury could conclude:

> [P]lacing Reid in an all concrete cell with one mat, knowing that he had a blood alcohol content of 0.349, knowing that he would not be drinking any alcohol for the next 10 to 12 hours, knowing that he would go through withdrawal, knowing that he had a history of withdrawal seizures, knowing that there would be no protocol medications at the jail and no one who could dispense them in any event, shows deliberate indifference to a known risk.

Even apart from the other components of the district court's rationale, these facts could support a finding of conscious disregard of a known risk.

However, there is more that a fact finder could use to discern McCune's state of mind. McCune stated that she ordered *extra sleeping mats* to be placed in the cell as a "significant safety precaution . . . so that if he was to fall, that it would cushion him." McCune testified that a corrections officer was responsible for placing the mats in Reid's cell and that she observed the extra mats in Reid's cell when she entered the cell to take his blood pressure. However, McCune's deposition testimony contradicts the notes that she made at the time, which instructed the corrections officers to "[m]ake sure he gets *a mat*." (emphasis added). Furthermore, Lt. Myers, Nurse Fogle, and the video of the incident all confirm that only one mat was in Reid's cell. Finally, McCune instructed the guards to "[j]ust keep an eye on him" and could not recall any additional instructions that she gave the corrections officers concerning the checks they were to perform. A reasonable jury could construe these facts as McCune "failing to take reasonable measures to abate" the substantial risk to Reid of which she was aware. *Farmer*, 511 U.S. at 847.

A reasonable jury thus could conclude that McCune had the "culpable state of mind" for deliberate indifference by observing facts from which to infer Reid was at serious risk for a seizure, actually drawing the inference, and then deliberately disregarding that risk when she approved him for incarceration and placed him in the concrete and cinder-block cell.

**B**

It is not enough for the plaintiff to show that a constitutional violation has occurred.

Additionally, "the plaintiff's facts, taken at their best, [must] show a violation of clearly established law." *Williams*, 186 F.3d at 689. However, while "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right," the specific action in question need not have been previously held unlawful. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Moreover, the defendant need not forecast the particularized harm that eventually befell the plaintiff. *Dominguez*, 555 F.3d at 550.

This court has recognized the right of inmates to obtain medical care under the Eighth Amendment as early as 1972. *Rich v. City of Mayfield Heights*, 955 F.2d 1092, 1096 (6th Cir. 1992). The Supreme Court delineated the bases of an Eighth Amendment violation when it held "that a prison official may be held liable . . . if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847.

It is important to note that deliberate indifference to a serious medical need is informed by the broader concept of deliberate indifference to a known risk. *Miller*, 408 F.3d at 812. This family of cases descends from *Farmer*, a case that dealt not with medical needs, but known danger from other inmates. *Farmer*, 511 U.S. at 834. The mere fact that the instant risk happens to be a specific medical one (seizures) does not alter the clearly established law that inmates and pretrial detainees are constitutionally entitled to protection from known substantial risks. *Dominguez*, 555 F.3d at 550. Viewed through this lens, any reasonable licensed practical nurse at the time of Reid's detention would have understood that placing a detoxifying inmate, who was at high risk for seizures, in a concrete and cinder-block cell without appropriate medical precautions would violate the inmate's

right to obtain medical care. That Reid had not yet manifested the most pronounced signs of withdrawal does not relieve an official from adhering to this duty to protect him from known substantial risks. The constitutional right to protection from substantial risks, which includes the right to medical care, was clearly established at the time of Reid's detention.

Thus, a reasonable jury could conclude that McCune acted with deliberate indifference to a known medical need or risk. Furthermore, Reid's right to protection from that risk was clearly established.

**IV**

Concerning the state-law claim, Ohio law provides civil remedies for medical negligence and wrongful death. *See Schirmer v. Mt. Auburn Obstetrics & Gynecologic Assocs., Inc.*, 844 N.E.2d 1160, ¶ 17 (Ohio 2006); Ohio Rev. Code § 2125.01. However, an employee of a political subdivision has sovereign immunity from suits seeking "to recover damages for injury, death, or loss to person or property allegedly caused by any act or omission in connection with a governmental or proprietary function."[11] Ohio Rev. Code § 2744.03(A). Because the operation of jails is a governmental function, Ohio Rev. Code § 2744.01(C)(2)(h), a jail employee retains the protection of sovereign immunity unless:

> (a) The employee's acts or omissions were manifestly outside the

[11] This court has jurisdiction over an interlocutory appeal from the denial of sovereign immunity from pendent Ohio-law claims. "An order denying statutory immunity is immediately appealable only if the state law provides immunity from suit, as opposed to immunity simply from liability." *Chesher v. Neyer*, 477 F.3d 784, 793 (6th Cir. 2007). Ohio revised its statutes in 2003 to make the denial of immunity immediately appealable as a final order, essentially providing officials with immunity from suit. *Ibid*. (citing Ohio Rev. Code § 2744.02(C)).

scope of the employee's employment or official responsibilities;

(b) The employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner; [or]

(c) Civil liability is expressly imposed upon the employee by a section of the Revised Code.

Ohio Rev. Code § 2744.03. The only issue before this court is whether the facts, taken in the light most favorable to the plaintiff, indicate that the acts or omissions were done "in a wanton or reckless manner."[12] *Ibid.*

The Supreme Court has acknowledged both that "deliberate indifference l[ies] somewhere between the poles of negligence at one end and purpose or knowledge at the other" and that "acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk." *Farmer*, 511 U.S. at 836. Ohio law has defined recklessness in light of the Restatement (Second) of Torts § 500 (1965) and requires that the official act or fail to act in a way that creates an unreasonable risk "substantially greater than that which is necessary to make his conduct negligent." *O'Toole v. Denihan*, 889 N.E.2d 505, 516–17 (Ohio 2008). "Distilled to its essence, . . . recklessness is a perverse disregard of a known risk." *Id*. at 517.

---

[12]Additionally, Plaintiff suggests that sovereign immunity is not available to McCune based on a statutory exemption, Ohio Rev. Code § 2744.09(E), for claims arising out of an alleged violation of the Constitution of the United States, Appellee Br. at 27. However, this argument misreads Ohio case law interpreting the statute, which permits the preclusion of immunity on federal claims but retains the possibility of immunity from state claims. *See, e.g.*, *Patton v. Wood Cnty. Humane Soc.*, 798 N.E.2d 676, 681 (Ohio Ct. App. 2003) ("[T]he immunities found within R.C. Chapter 2744 do not apply to Section 1983 actions. However, defendants may still be entitled to immunity on the state-law tort claims."); *McCallister v. City of Portsmouth*, 673 N.E.2d 195, 197 (Ohio Ct. App. 1996) ("It is plain from a reading of the statutes that appellees are immune from any claims the appellant has against them which are tort claims or claims under the constitution or statutes of the state of Ohio.").

While the threshold for liability appears to be slightly higher under Ohio law, for the same reasons discussed above, a reasonable jury could conclude that McCune acted with a perverse disregard for a risk under Ohio law by placing Reid in a concrete and cinder-block cell in the face of looming withdrawal seizures. McCune contends that no reasonable jury could find that she "was conscious that, in all probability, Reid would suffer a *life-threatening* injury." Appellant Br. at 25–26 (internal quotation marks omitted) (emphasis added). While this may be true, Ohio law does not require she foresee a *specific* or *life-threatening* injury. In fact, it is sufficient that she was aware that an injury was probable. *O'Toole,* 889 N.E.2d at 517. Because a reasonable jury could find that McCune was aware of a probable injury to Reid, the district court was correct in determining that she is not entitled to sovereign immunity under Ohio law.

**V**

For the foregoing reasons, we AFFIRM the district court's judgment denying both qualified and sovereign immunity.